[Civ. No. 17394. First Dist., Div. Two. Apr. 11, 1957.]

Estate of MARGHERITA GAGLIASSO, Deceased. ANGE-LINA CONROTTO et al., Appellants, v. DARIO ZAP-PELLI et al., Respondents.

Todd & Todd, Donald B. Richardson and O. H. Speciale for Appellants.

Bressani & Hansen for Respondents.

DOOLING, J.—This case involves the contest before probate of the will of Margherita Gagliasso who died in November 1954. Contestants are the three daughters of decedent. The contest was based on the grounds of lack of due execution, unsoundness of mind, and undue influence and fraud in procuring the will's execution. The court granted a nonsuit at the close of the contestants' case. There is no question presented as to the due execution of the will, but appellants urge that there was sufficient evidence to go to the jury on the other grounds.

The will was executed on January 12, 1953, when the decedent was 87 years of age. She gave the bulk of her estate to her four sons making only minor provisions for the three daughters.

The evidence stated most favorably to appellants shows that in April, 1952 Angelina Conrotto, one of the contestants, called at her mother's home and found her alone, partly blind and undernourished. Decedent's home was filthy and disordered. Angelina stayed with her mother for a few days, arranged with a cousin to stay with her for another few days,

and then returned and was with her mother almost constantly from April until August of 1952. Decedent requested Angelina to live with her and take care of her and to this end agreed that Angelina should be appointed her guardian. In August, 1952 Angelina and decedent visited an attorney and a petition for guardianship was prepared and filed. The other children when notified of the pending petition to have Angelina appointed guardian for her mother consulted an attorney and filed an opposition. When the petition for guardianship came on for hearing it was dismissed by the attorney without prejudice on the court's refusal to grant him a continuance.

A few days before the hearing in the guardianship proceeding Angelina's brother Fiuri entered the mother's home and struck Angelina in the face, breaking her nose and blackening both eyes. The following day the brother Charles came and took decedent to his home. None of the three sisters was ever permitted by their brothers to see their mother alone after that. A few days after the dismissal of the guardianship proceeding Angelina went to see her mother and the mother said to her in a low tone: "You had better not stay here. They certainly have it in for you."

Shortly thereafter the mother was taken to live in the home of her son Fiuri and lived with him and his wife from that time on.

Shortly after the dismissal of the guardianship petition the attorney who had been employed to contest the guardianship petition and who later drew the decedent's will prepared and decedent signed a request to decedent's attorney to transmit to him all of the files and papers of decedent. This document was witnessed by two of the sons, Fiuri and Charles.

A few weeks before the execution of the will the decedent was brought to the attorney's office by Fiuri and his wife Elvira to discuss the drawing of a will. The attorney insisted that they remain in the anteroom while he discussed the matter with decedent. When the will was ready for execution the same procedure was followed, Fiuri and his wife taking the decedent to the attorney's office and being excluded from the attorney's room while the will was read, translated into Italian for decedent's benefit and then executed. The decedent's hand was so shaky that she could not sign her name and she made a cross with the assistance of the attorney who put his hand on hers to steady it. There was evidence of earlier declarations of the decedent that she intended to leave her property in equal shares to all of her children.

The son Fiuri had operated the decedent's ranch property for her for a number of years. In the earlier years the profits were divided equally among decedent, Fiuri and his brother John, who was blind. For the last few years the profits were divided between Fiuri and John. In the Autumn of 1952 decedent transferred to Fiuri an indebtedness due to her which was secured by a mortgage upon his promise to care for her for the balance of her life. The mother in 1952 was old, feeble and partially blind. There was testimony that at times she was incoherent and had difficulty carrying on a conversation. The evidence certainly would support the inference that from the time that she went to live with Fiuri and his wife she was sufficiently enfeebled to be totally dependent on them for her care.

■ At the outset appellants argue that there was no sufficient specification of the grounds of insufficiency of the evidence to support the granting of a nonsuit.

The grounds as stated at the opening of the presentation of the motion, that the evidence was not sufficent to support each of the grounds of contest was certainly too general under the rule announced in *Eatwell* v. *Beck*, 41 Cal.2d 128 [257 P.2d 643] and *Lawless* v. *Calaway*, 24 Cal.2d 81 [147 P.2d 604]. However, in the course of the argument specific alleged defects in the proof were pointed out with citation of authorities to support the claim of their insufficiency. The argument as a whole left no doubt as to the specific alleged defects in the proof relied upon and appellants' counsel in his argument answered the points so made. We are satisfied on the whole record of the argument of the motion that the alleged defects in proof were pointed out with sufficient specificity to satisfy the rule of the cited cases.

### The Issue of Undue Influence and Fraud

■ It is now settled that ". . . when the contestant has shown that the proponent of a will sustains a confidential relationship toward the testator, and actively participates in procuring the execution of the will, and unduly profits thereby, the burden then shifts to the proponent to prove that the will was not induced by his undue influence." (*Estate of Pellegrini*, 138 Cal.App.2d 143, 145 [291 P.2d 558]; *Estate of Rugani*, 108 Cal.App.2d 624, 629 [239 P.2d 500]; *Estate of Abert*, 91 Cal.App.2d 50, 58 [204 P.2d 347].)

That Fiuri might reasonably be found to have occupied a confidential relation to his mother is made clear by the evidence. She entrusted the operation of her ranch property to

him for many years. He divided the profits from this operation without rendering any detailed accounting. He agreed to care for her for the balance of her life in consideration of the transfer of a valuable mortgage to him, and his mother was living with him dependent upon the ministrations of himself and his wife because of her enfeebled condition. It is equally clear that Fiuri unduly profited from the will at the expense of his sisters, the contestants.

Respondents point to the lack of any direct evidence of any pressure brought upon decedent to induce her to execute the will and insist that there is no evidence that any one of them ''actively participated in procuring the execution of the will.'' ■ However, it is settled that activity in procuring the execution of a will may be established by circumstantial evidence. (*Estate of Jamison*, 41 Cal.2d 1, 8 [256 P.2d 984] ; *Estate of Washington*, 116 Cal.App.2d 139, 145 [253 P.2d 60] ; *Estate of Leonard*, 92 Cal.App.2d 420 [207 P.2d 66] ; *Estate of Abert, supra*, 91 Cal.App.2d 50, 52, 60.)

■ Here we have a course of conduct by Fiuri commencing with a physical assault upon his sister Angelina who was then caring for her mother at the mother's request, followed by another brother almost immediately inducing the mother to leave Angelina and go with him. We have the mother signing a request to transfer her records and legal papers from her previous attorney to the attorney chosen by the other children to resist the guardianship petition filed by Angelina with her mother's consent, and this request is witnessed by two of the respondents, one of them Fiuri. We have Fiuri, his wife and his brother John persistently refusing to permit any of the contestant daughters to have a private conversation with their mother or to be alone with her without one or more of the three being present. We have an enfeebled old woman, partially blind, and almost completely dependent on the ministrations of Fiuri and his wife. While it is true that the attorney, with commendable zeal, was careful to exclude Fiuri and his wife from his actual conferences with decedent we have Fiuri and his wife taking the decedent to the attorney's office on both occasions and on both occasions remaining with her until the attorney asked them to withdraw.

It is rare that the facts of two cases so closely parallel one another as the facts of this case and those in *Estate of Leonard, supra*, 92 Cal.App.2d 420. In the Leonard case the court summarized the facts on pages 428-429 :

''The evidence presented to the jury shows that the testator

executed the attacked will while he was living in the home of his sister Mrs. Danielson, and at a time when he was described as an obedient child who would do anything anyone 'wanted him to do if they handled him right.' He had lived intermittently with contestant for many years, and by a prior will had made the nephew and his wife the sole beneficiaries of his estate, yet shortly after moving to the Danielsons' his whole attitude toward the contestant completely changed. He was restricted to the premises of the Danielson home and could not leave them unaccompanied. The Danielsons sought to prevent him from conversing with the contestant or his wife. The beneficiaries obtained a lawyer for the testator and always accompanied him to the lawyer's office. The beneficiaries of the challenged will took the entire estate to the exclusion of the contestant who, with his wife, were the sole beneficiaries of the prior will which was executed at a time when the testator was admittedly of sound mental capacity and possessed of a fiery and independent personality.''

The basic facts in this recital find their substantial parallel in this case. The court in Leonard concluded that the facts were sufficient to support the inference that the beneficiaries in that case actively participated in procuring the execution of the will and reversed the case for a new trial on the ground of undue influence. We are satisfied that the same order must be made herein.

### The Issue of Incompetency

█ The incompetency to make a will must be shown to exist at the very time of the will's execution. (*Estate of Lingenfelter*, 38 Cal.2d 571, 580 [241 P.2d 990].) There was testimony of the attorney who prepared the petition for guardianship that when he saw the decedent at that time she could not tell him the nature or extent of her bank accounts and testimony of the contestants that at various times when they saw her after she had gone to live with Fiuri they found her confused or unable to converse coherently and concluded that she was incompetent. Since they, at best, saw decedent infrequently and always in the presence of Fiuri, his wife, or John (because of their refusal to permit them to be alone with her at any time) they could not testify whether the conditions which they described were permanent or temporary. A physician who treated her eyes about the time the will was prepared and executed found her in good health for her age. █ The only testimony bearing on her competency at the time of the execution of the will is to the effect that she understood and

discussed its provisions as they were translated to her in Italian. There was no sufficient proof to go to the jury that decedent at the time the will was executed was incompetent. (*Estate of Lingenfelter, supra,* 38 Cal.2d 571.)

The judgment of nonsuit is reversed for a retrial of the issue of undue influence and fraud, otherwise it is affirmed.

Kaufman, P. J., and Comstock, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.