[Sac. No. 7106.   In Bank.   Dec. 22, 1961.]

Estate of THERESA GARIBALDI, Deceased.   JOSEPH GARIBALDI et al., Petitioners and Appellants, v. HENRY GARIBALDI et al., Contestants and Respondents.

Wilke, Fleury & Sapunor, Richard H. Hoffelt and Howard A. Potts for Petitioners and Appellants.

Mazzera, Snyder & DeMartini and J. Calvert Snyder for Contestants and Respondents.

GIBSON, C. J.—A document offered as the holographic will of the decedent, Theresa Garibaldi, was denied probate on

the ground that it was procured by undue influence. The three proponents (Leona, Joseph, and Leo) and the five contestants (Elvira, Edith, Henry, Clarence, and Raymond) are the surviving children and sole heirs at law of decedent.

Decedent died in October 1956 at the age of 87. The holographic document, which was written in Italian less than four months before her death, was translated as follows:

"June 16, 1956

"I declare that I, Leona, Joe and Leo are partners in the properties and in the debts. Therefore I will that my share be divided into equal shares to Leona, Joe, and Leo.

"And we partners must pay Elvira, Edith, Henry, Clarence, and Raymond $7,000.

Theresa Garibaldi."

Decedent's husband died in 1939 leaving her three parcels of real property referred to as the home ranch, the river ranch, and the mountain ranch. Her net worth at that time was approximately $46,800. The ranches, which were enlarged by purchases, greatly appreciated in value and were worth about $700,000 at the time of her death. She lived at the home ranch with the proponents, who were not married. The contestants had been raised on the home ranch but upon marriage each had moved away, apparently prior to 1939. They often visited and helped decedent, and some of them took care of her at times. She was fond of all her children and grandchildren, and on several occasions, including once in April 1956, she stated that she wanted all her children to share equally in any property she might leave.

During the last eight years of her life decedent suffered from a number of ailments including hypertension, sciatica, arteriosclerosis, hernia, diverticulosis of the colon, dyspnea, pleural effusion, nonfunctioning gall bladder, portal cirrhosis, and hypertrophic arthritis of the spine. She was under the constant care of a physician and was hospitalized on five occasions, once for a period of seven months. For more than two years prior to her death she had a special nurse and was unable to walk by herself. Her speech was hesitant and fumbling for the last four or five months, and her mind was "not too clear."

After the death of decedent's husband, proponents managed her business affairs except for the mountain ranch which was managed by Henry. She trusted her children and would sign without question any instrument they would give her.

Proponents testified that an oral partnership was formed, and partnership income tax returns were filed in the names of decedent and proponents. Bank accounts in the joint names of decedent and proponents contained about $3,500 at the time of her death; additional accounts opened in 1949 and 1950 in the names of proponents alone contained approximately $80,000. The funds in all of these accounts were derived from ranch operations. Other receipts from ranch operations were used to purchase over 2,500 acres of land, title to which was taken solely in the name of one or more of the proponents.

Proponents never made an accounting to their mother. Although Joseph claimed that he discussed business matters with her on numerous occasions, he admitted that discussions of her net worth after 1939 were based on the figures for that year, and he did not recall informing her of her net worth as of any subsequent year. When contestants visited their mother they did not discuss business matters with her and were specifically warned not to do so by proponents who said that such discussions would upset her. From time to time Henry brought to the home ranch checks aggregating $100,000 in favor of decedent for the sale of timber from the mountain ranch. At first he gave them to his mother, but during the last five or six years before her death he left them with Leona because she told him not to show them to decedent but to leave them with her and she would take care of them. Contestants did not learn of the alleged partnership agreement until after her death.

According to Joseph, decedent had several discussions with him, Leo and Leona about giving the five contestants a share of their father's estate, and decedent said that she wanted to give each of them one-ninth of the 1939 estimate of the estate, which would amount to $5,200 each, but he and Leo told her to give the contestants $7,000 each so that Henry could see they were "overpaid."

In August of 1949 Joseph took his mother to the office of an attorney who was instructed to prepare a deed granting all of her real property to proponents, an instrument by which contestants would release to proponents all rights to succeed to property owned or thereafter acquired by their mother, an assignment to proponents of decedent's rights under certain timber contracts, and a "Statement Concerning Distribution of the Theresa Garibaldi Property" which recited that she had decided to give $7,000 to each contestant and the rest of her real and personal property to the proponents because

they had stayed on the property and helped her to manage it. Decedent had never been to the attorney's office before and never returned there.

In September of 1949, decedent went with Joseph and Leona to a notary, signed the deed, and had her signature acknowledged. None of the contestants learned of the deed until after her death, and it was not recorded until 1958. In September of 1949 after the deed was signed Joseph asked Raymond to come to the home ranch, and when he arrived Joseph handed him a check for $7,000, stating that it was a gift. Raymond signed a paper which Joseph said was "just to cash the checks." In fact, the paper was the release of rights in his mother's property. Henry, who came to the home ranch later that day, was also asked by Joseph to accept a check for $7,000 and sign the release, but he refused to do so.

Contestants first learned of the existence of the will about five months after decedent's death when they received a letter from Teresa Corsiglia, an attorney to whom Joseph had taken the will. Decedent had never met Miss Corsiglia, and there is evidence from which it could be inferred that she was Joseph's attorney. The letter stated that decedent had left a will which provided that all her property should go to proponents upon condition that they pay contestants $7,000 each and also stated that Joseph was petitioning to be appointed administrator of the estate. Contestants went to see proponents at the home ranch, and Joseph told them that when he informed his mother he had made his will she requested a pen, ink, and some paper, which he gave her, and that she then wrote the will. Joseph admitted that it had always been decedent's wish that the children "share and share alike." During the discussion, Raymond stated that, while the letter from the attorney said the five contestants were to receive $7,000 each, the will provided for only $7,000 for the five of them. Raymond showed the will to Leona, who threw up her hands and said, "Oh, no, we made a mistake."

The findings of the court may be briefly summarized as follows: Decedent loved her children equally well, and the document offered for probate was "unnatural as her will." From the time of their father's death a confidential relationship existed between proponents and decedent. They wrongfully misused her trust and confidence to obtain an unfair advantage over her and wilfully suppressed and failed to disclose to her material facts concerning the value of her property which they had a duty to disclose. As a result decedent did not know the

true nature and extent of her property, and by reason of old age and protracted sickness she was easily imposed upon by proponents. The will was not the product of her volition but of theirs, and it was procured by their undue influence.

It is undisputed that a confidential relationship existed between decedent and proponents. Where it appears, in addition to such a relationship, that the will is unnatural and would result in undue profit to a proponent and that he was active in procuring its execution, there is persuasive evidence of undue influence. (*Estate of Jamison*, 41 Cal.2d 1, 10 [256 P.2d 984]; *Estate of Teel*, 25 Cal.2d 520, 528 [154 P.2d 384].) Another factor which has been considered in support of a finding of undue influence is the existence of a mental and physical condition permitting subversion of the decedent's freedom of will. (*Estate of Teel, supra*, 25 Cal.2d at p. 527; see *Estate of Lingenfelter*, 38 Cal.2d 571, 585 [241 P.2d 990].)

The evidence is sufficient to sustain the determination that the will was unnatural and would result in undue profit to proponents. Contrary to the repeatedly expressed desire of decedent that her children should share her property equally, each proponent would receive substantially more under the will than each contestant.

There was ample opportunity for proponents to control the testamentary act of decedent. They lived with her and managed most of her business affairs, and she trusted them and would sign any instruments they would present to her. At the time she made the will she was of advanced age, with a long history of illness, and her mind was "not too clear." It could be inferred that her mental and physical condition was such as to permit a subversion of her freedom of will.

Activity on the part of proponents in procuring the execution of the will may be established by inference, that is, by circumstantial evidence. (*Estate of Jamison*, 41 Cal.2d 1, 8 [256 P.2d 984]; *Estate of Gagliasso*, 150 Cal.App.2d 65, 69 [309 P.2d 513].) As we have seen, there was evidence that Joseph was present when the will was executed, that he gave decedent pen, ink and paper, that she wrote the will and immediately gave it to him, that he took it to his attorney, whom she did not know, and that contestants had no knowledge of its existence for several months after her death. The evidence relating to proponents' management of decedent's business affairs showed that, by taking advantage of their confidential relationship, they engaged in a course of fraudu·

lent conduct designed to conceal from decedent the large increase in her net worth occurring after 1939 and to mislead her into believing that an equal division of her property among her children would be accomplished by giving each contestant $7,000.

It is significant that when Leona was told by Raymond that the letter from Attorney Corsiglia stated each contestant was to receive $7,000 but that the will provided for only $7,000 for the five contestants, she exclaimed, ''Oh, no, we made a mistake.'' In the light of the evidence of fraudulent conduct by proponents the trier of fact could reasonably treat the remark as an admission that proponents had participated in the preparation of the will and had inadvertently failed to provide clearly for carrying out their plan of allowing each contestant $7,000.

Although fraud and undue influence are separate grounds for setting aside a will (Prob. Code, § 22), they are closely related, and fraud may be considered in determining whether there was undue influence. (E.g., *Estate of Newhall,* 190 Cal. 709, 718 [214 P. 231, 28 A.L.R. 778]; *Estate of Stoddart,* 174 Cal. 606, 610 [163 P. 1010]; *Estate of Ricks,* 160 Cal. 450, 480 et seq. [117 P. 532]; *Estate of Snowball,* 157 Cal. 301, 305-306 [107 P. 598]; see 1 Page on Wills (1960) pp. 693-695; Fraud as distinguished from undue influence as ground for contesting will, 28 A.L.R. 787.) While a showing of more than mere fraud is necessary in order to set aside a will on the ground of undue influence, such a showing, as we have seen, was made in the present case. The evidence is sufficient to support the judgment.

There is no merit in the contention of proponents that the court committed prejudicial error by permitting certain amendments to the pleading of contestants and the pretrial order. Evidence establishing the matters added by the amendments was properly received under the issues framed by the pleadings and pretrial order as originally filed. The amendments were therefore unnecessary, and proponents were not prejudiced by the order of the court allowing them to be made.

The judgment is affirmed.

Traynor, J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.