[Civ. No. 23645. First Dist., Div. Four. Aug. 1, 1967.]

Estate of MABEL GOETZ, Deceased. WILLIAM GOETZ, Plaintiff and Appellant, v. EARL WILLIAM ROBERTS, Defendant and Respondent.

Todd & Todd, J. Elwood Andresen and Henry C. Todd for Plaintiff and Appellant.

Murphy & Murphy, Frank Murphy, Jr., and George A. Strong for Defendant and Respondent.

DEVINE, P. J.—Appellant contested his wife's will, which named her son by a former marriage executor and sole beneficiary, on the grounds of lack of testamentary capacity and undue influence. The jury found in favor of the proponent of the will on the first ground; the trial judge granted a nonsuit on the issue of undue influence. So far as the judgment is based on the verdict, appellant contends that the evidence does not support the verdict and that the judge committed prejudicial misconduct. As to the nonsuit, he contends that substantial evidence had been presented in support of the contest.

*The Parties and the Properties*

Mabel Goetz died on November 25, 1964, at the age of 82. During her lifetime she had executed but one will, that dated November 20, 1963. This will leaves her entire estate to respondent Earl William Roberts, and expressly excludes her

husband for the reason, as expressed in the will, "that he is financially well off," and excludes her daughter, Winona Beth Mersereau, respondent's sister, for the reasons, also stated in the will, "that she is financially well off, and . . . that she has not visited me for many years." The daughter resided in Mexico.

William and Mabel Goetz were married on June 10, 1952, having lived together as husband and wife since 1928 or 1929. At the time of trial, in 1965, the husband was 78 years of age. Toward the end of her life, Mrs. Geotz expressed hostility toward and suspicion of her hsuband. On one or more occasions she suspected him of attempting to poison her, and she related incidents of his mistreating her. The husband denied any misconduct, and we may assume for purposes of the appeal that the wife's statements about her husband were, in general, unfounded and perhaps delusionary. Mrs. Goetz objected to her husband's being accompanied by a house-keeper when he visited her, his wife, at a rest home, and she remarked that the housekeeper was drinking. (Dr. Reed, witness for respondent, had observed on one occasion that the housekeeper possibly was under the influence of intoxicants.) The husband petitioned to have his wife committed as mentally ill in February 1963, but this was not carried through.

When testatrix was in a rest home she spoke of her fondness for her son, respondent, and, according to the testimony of the woman who operated the home, she "idolized him." At times she would live with the son and his wife at Cloverdale, California, about two hundred miles away from the Goetz home in Boulder Creek. Letters sent by testatrix show a maternal affection for her daughter. The daughter does not contest the will. She is named a respondent by contestant.

A parcel of land in San Jose was asserted by the son to be his mother's separate property and by the husband to be community property, in conservatorship proceedings. But whatever the status of this parcel, substantially all of the property of the Goetzes was acquired from his earnings as a manufacturing jeweler.

Other real properties were held in joint tenancy. Stocks of a value of about $350,000 were in their joint names.[1] Two relatively small bank accounts were in testatrix' name, and one was in her name as trustee for her husband so that she could make withdrawals if he became ill.

---

[1] It does not appear whether the stocks were held in joint tenancy or simply in both names.

## The Making of the Will

On September 11, 1963, Mrs. Goetz gave her son a general power of attorney. This, he testified, was to enable him to draw funds out of her bank accounts. The son testified that on October 14, 1963, they went to her safe deposit box at a bank in Santa Cruz. He had authority to sign and enter the box, apparently because she had arthritis and could not write well. Prior to this time, Mrs. Goetz had never mentioned making a will. She asked the lady at the bank who had charge of the safe deposit vault to recommend an attorney. The lady recommended attorney Dent Snider, to whose office Mrs. Goetz and her son immediately went. The son denied any participation in the conversation with the attorney. Mrs. Goetz asked her son, "How do you want the Will made out?" and he answered that he did not care, that she should do as she wanted, and that he did not care if she left him anything.

The attorney testified that Mrs. Goetz discussed her family and the nature and extent of some of her property. She said that her husband and her daughter were both well off and were to be omitted from her will. The attorney spent considerably more time with her than he would normally for the preparation of such a simple will. She had told him of her marital difficulties, that her husband had attempted to have her committed, and that she felt he might contest the will. Because of this situation, and because of her age and poor health, he took an "abundance of precaution" to satisfy himself that she had adequate testamentary capacity. He suggested that Dr. Reed be present when the will was signed. The son participated in the conversation, but "only in a general way."

Snider telephoned Mrs. Goetz when the will was ready. She asked her husband to take her to Snider's office and go over the will, but he apparently refused. The son had written to Dr. Reed, asking him to take his mother to the office when the will was ready, but Reed had not responded to the son's letter. The son, therefore, came to Boulder Creek and he and his wife took Mrs. Goetz to Snider's office on November 20, 1963. Snider read the will to her, and she read it to herself out loud. She then signed it. Snider and his secretary witnessed the execution.

### Facts and Law on the Issue of Competency

Competency to make a will is presumed. (*Estate of Fritschi*, 60 Cal.2d 367, 372 [33 Cal.Rptr. 264, 384 P.2d 656];

*Estate of Wynne,* 239 Cal.App.2d 369, 373 [48 Cal.Rptr. 656].) The burden is on the contestant to prove that at the very time of the execution of the will testatrix was incompetent. (*Estate of Jamison,* 41 Cal.2d 1, 13 [256 P.2d 984].) ■ The jury having found that testatrix was competent, the verdict must be sustained as against the attack on the ground of insufficiency of evidence if there is any substantial evidence to support it. (*Estate of Llewellyn,* 83 Cal.App.2d 534, 543 [189 P.2d 822, 191 P.2d 419]; *Estate of Wynne, supra,* p. 372.) There is no difficulty in sustaining the jury's action.

The points made by appellant on this issue, together with opposing evidence and comments on the law, are set forth in the series that follows:

■ 1. Appellant produced evidence of forgetfulness, erratic, unstable and emotional behavior, and of suspicion, probably delusional at times, on the part of the testatrix. This is of no avail unless it were shown, as it was not, that it had direct influence on the testamentary act. (*Estate of Lingenfelter,* 38 Cal.2d 571, 581 [241 P.2d 990]; *Estate of Perkins,* 195 Cal. 699, 703-704 [235 P. 45]; *Estate of Wynne, supra,* p. 374; *Estate of Nelson,* 227 Cal.App.2d 42, 55 [38 Cal.Rptr. 459].) ■ Even hallucinations, in order to destroy a will, must operate directly upon the act. (*Estate of Morgan,* 225 Cal.App.2d 156, 168 [37 Cal.Rptr. 160]; *Estate of Lingenfelter, supra,* p. 581; *Estate of Wynne, supra,* p. 373.) The only reference which testatrix made about omitting her husband as beneficiary when she was giving instructions to the attorney was to the husband's financial status. There was nothing delusionary about this. If the parties were joint tenants of the stocks, the husband would have a fortune probably in excess of $400,000, less taxes and expenses, which, particularly at his age, would be ample justification for the testatrix' opinion; and even if the stocks were community property, the husband, by holding one half, would be comfortably prosperous. Nothing was said by the testatrix to the attorney about misconduct, real or imaginary, on the part of the husband.

2. Appellant also relies on evidence of broad character which would establish mental incompetency generally. This consists of expert testimony of Dr. Reed, testatrix' treating physician, who had known her since early 1963; of Dr. Maeth, who had examined her at the time of the proposed commitment; of Dr. Anderson, a psychiatrist who did not see her until about three and a half months after the will was made, to the effect that Mrs. Goetz suffered chronic brain syndrome

caused by senile dementia; and by various expressions their testimony denied Mrs. Goetz' testamentary capacity. The jury was instructed that proof of unsound mind emanating from a permanent and progressive mental disease such as senile dementia will be presumed to continue in the absence of evidence to the contrary. This instruction goes to the very limit of the reference in *Estate of Fosselman*, 48 Cal.2d 179, 186 [308 P.2d 336], to this type of evidence as an inference and "perhaps" even a legal presumption.[2]

But the jury was free to find against the medical testimony and against the presumption, if one existed, of an asserted continuing mental condition. Medical testimony is not conclusive on the issue of testamentary capacity. (*Estate of Jamison*, 41 Cal.2d 1, 13 [256 P.2d 984]; *Estate of Glass*, 165 Cal.App.2d 380, 383-384 [331 P.2d 1045]; *Estate of Bullock*, 140 Cal.App.2d 944, 948 [295 P.2d 954, 297 P.2d 633].) Nor was it without elements of weakness. Dr. Reed wrote to respondent on October 26, 1963, that at times Mrs. Goetz "is well oriented and fairly alert." When one has a mental disorder in which there are lucid periods, it is presumed that his will has been made during a time of lucidity. (*Estate of Lingenfelter, supra*, 38 Cal.2d 571; *Estate of Darilek*, 151 Cal.App.2d 322, 327 [311 P.2d 615].) Dr. Anderson conceded that testatrix presumably would understand the language of a will leaving everything to her son.

3. Opposed to the testimony of the doctors is that of six acquaintances of Mrs. Goetz during 1963 and 1964, whose testimony about her soundness of mind was not shaken under cross-examination. There is also the testimony of Dent Snider, the attorney who drew the will, to the effect that Mrs. Goetz gave the names and residences of her husband, son and daughter, the occupation of her daughter's husband, the date of her own marriage, the time of acquiring the house which was her separate property, the fact that her present home was in joint tenancy, that she and her husband had numerous stocks and bonds in their joint names or in her husband's, her reasons for excluding her husband and her daughter, and her desire that everything go to her son. The attorney's testimony, although not conclusive, is entitled to much weight, particularly when, as here, he is a subscribing witness.

---

[2]The presumption that "A thing continues to exist as long as is usual with things of that nature," which was expressed in Code of Civil Procedure section 1963, subdivision 32, has been abolished as a presumption. It is restated as a maxim of jurisprudence. (Civ. Code, § 3547.) This change came about subsequent to the trial. (Stats. 1965, ch. 299, § 13.)

(*Estate of Hansen,* 38 Cal.App.2d 99, 115 [100 P.2d 776].) ▪ The instructions given by the testatrix to her attorney were an element of proof of competency. (*Estate of Lingenfelter, supra,* p. 582; *Estate of Morgan, supra,* 225 Cal.App.2d 156, 170; *Estate of Ross,* 204 Cal.App.2d 82, 92 [22 Cal.Rptr. 135]; *Estate of Russell,* 80 Cal.App.2d 711, 720 [182 P.2d 318].)

▪ But perhaps the most persuasive of all the evidence are the letters written in her own hand by Mrs. Goetz to her daughter, notably one on September 5, 1963, and one on October 22, 1963, because these are close to the time of making the will, the latter having been written between the date of giving instructions to the lawyer and the date of the execution of the will. The letters are intelligent, chatty, and well put together. They exhibit orientation as to time and place. Not only are they independent evidence of competency, but they also serve to overcome much of the testimony of the doctors, or at least to confirm those parts of the physicians' testimony relating to the existence of lucid periods.

### The Issue of Undue Influence

At this point we take an opposite criterion, for testing the court's judgment. We must reverse the judgment of nonsuit if there is substantial evidence which would have supported a verdict for contestant. Because of the verdict on the issue of competency, it is established that testatrix knew the nature of the testamentary act, the nature of her estate, and the persons who had claim to her bounty. The evidence tending to show impaired mentality, however, is relevant so far as it may show susceptibility to undue influence.

▪ Undue influence, in order to destroy a solemnly executed will, must be such as operates directly upon the testamentary act. (*Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25]; *Estate of Locknane,* 208 Cal.App.2d 505, 514 [25 Cal. Rptr. 292].) In this case, as in most others in which the issue of undue influence is raised, direct evidence cannot be pro- ▪ ▪ Contestant relies on circumstantial evidence, and in particular on the presumption which arises from the confidential relationship between the party making the will and the one alleged to have exerted undue influence, where there has been activity on the part of the beneficiary in the procurement of the will and undue profit to him. (*Estate of Graves,* 202 Cal. 258, 262 [259 P. 935]; *Estate of Garibaldi,* 57 Cal.2d 108, 113 [17 Cal.Rptr. 623, 367 P.2d 39].) Respond-

ent does not dispute the existence of the confidential relationship. But all three elements are needed for the presumption. (*Estate of Trabucco*, 192 Cal.App.2d 643, 645-646 [13 Cal. Rptr. 468]; *Estate of Robbins*, 172 Cal.App.2d 549, 554 [342 P.2d 933].)

The elements of activity of the beneficiary, as cited in appellant's brief, and our comments on them are:

1. Respondent took his mother into the lawyer's office on the first visit, when she gave her instructions for drafting the will. (If because of the nonsuit we ignore the testimony that the lawyer was not previously known to respondent, but was recommended by an employee of the bank, we are left with no evidence at all as to how the lawyer was engaged.) This in itself has been held not to constitute undue influence. (*Estate of Ausseresses*, 178 Cal.App.2d 487, 491 [3 Cal.Rptr. 124]; *Estate of Bould*, 135 Cal.App.2d 260, 275 [287 P.2d 8, 289 P.2d 15]; *Estate of Lingenfelter, supra*, 38 Cal.2d 571, 586; *Estate of Anderson*, 185 Cal. 700, 717 [198 P. 407].)

2. Respondent tried to get Dr. Reed to witness the will, but the doctor declined unless Mrs. Goetz were seen by a psychiatrist. Respondent did not take his mother to a psychiatrist. However, there is no requirement that a psychiatrist pass upon the competency of a person to make a will. Mrs. Goetz had expressed indignation at the proceedings initiated by her husband in February 1963. The son need not have proposed psychiatric examination to his mother, which she might have resented. As to this point, there is an asserted omission rather than positive activity on respondent's part.

3. Respondent took his mother to the lawyer's office for the execution of the will. This, too, is not such activity as to raise the presumption. (*Estate of Jacobs*, 24 Cal.App.2d 649, 652 [76 P.2d 128]; *Estate of Lombardi*, 128 Cal.App.2d 606, 608-609, 613 [276 P.2d 67]; *Estate of Bould, supra*, pp. 275-276; *Estate of Straisinger*, 247 Cal.App.2d 574, 586 [55 Cal.Rptr. 750].)

4. Respondent remained in the lawyer's office during the giving of the instructions, as well as during the execution of the will. Here, again, the activity is insufficient. It is better practice for the lawyer to exclude others during his conference with one who is about to make a will (see *Estate of Gagliasso*, 150 Cal.App.2d 65, 69 [309 P.2d 513], but their presence does not amount to the activity which, with other elements, creates the presumption of undue influence. (*Estate*

*of Easton,* 140 Cal.App. 367, 376 [35 P.2d 614]; *Estate of Morcel,* 162 Cal. 188, 197 [121 P. 733].)

5. Appellant proposes that the question of Mrs. Goetz to respondent on their first visit to the lawyer, as testified by respondent, "How do you want the Will made out?" implies a prior discussion of the will between the two. We do not think this necessarily follows; but even if there had been a prior discussion this would not be evidence of undue influence. It is not uncommon for persons to tell their prospective legatees what they intend to do, or even to ask their preferences. Here, again, if we omit consideration of respondent's reply, disclaiming any demand for consideration, we are left with nothing to show an influence overpowering the will of the decedent. Affirmative evidence is not created by discarding that which is contradictory. (*Estate of Ausseresses, supra,* 178 Cal.App.2d 487, 490-491.)

Opportunity and motive to exert undue influence are insufficient to destroy a will. (*Estate of Welch,* 43 Cal.2d 173, 175 [272 P.2d 512]; *Estate of Locknane, supra,* 208 Cal.App. 2d 505, 514.)

Putting together all of the circumstances related above, we do not find present the element of noxious activity which is a necessary prong in the tridental presumption.

We find insufficiency of proof to support the third element of the presumption of undue influence: undue profit to the beneficiary. An important consideration in this regard is the lack of evidence that the testatrix at any time made declarations of an intention at variance with the terms of the will. (*Estate of Darilek, supra,* 151 Cal.App.2d 322, 331.) In this respect, the case differs from *Estate of Teel,* 25 Cal.2d 520 [154 .2d 384]; *Estate of Garibaldi,* 57 Cal.2d 108 [17 Cal. Rptr. 623, 367 P.2d 39]; and *Estate of Gagliasso,* 150 Cal. App.2d 65 [309 P.2d 513], cited by appellant. In fact, Dr. Reed testified that some months after the date on which the will was executed, Mrs. Goetz told him that she wished her son to have "what was hers" when she died, although she did not understand why he was presently receiving her mail and social security checks. She told Dr. Anderson that she had given her son power of attorney and although his understanding, from a conversation with her some months after the date of execution of the will, was not "very specific," it was "vaguely" to the effect that she had made a will and that everything was going to her son.

We now consider whether the provisions of the will

are unnatural as against the husband. It is noted that appellant's opening brief in this respect refers only to the exclusion of the daughter. But this no doubt is simply because testatrix was perfectly right in her declaration that the husband was financially well off. It was, indeed, entirely natural that testatrix should consider that in view of her husband's advanced years he would have an ample amount, not only for his own needs but also for such testamentary disposition as he might care to make. Mrs. Goetz' husband and her son had not been on good terms and it is unlikely that the husband would have left anything to respondent.

We find it a bit strained to accept appellant's intercession for testatrix' daughter. The daughter herself did not join in the contest. Testatrix described her as financially well off, and there is no evidence that the description was incorrect. It is true that a successful contest would have brought about intestacy. But the joint tenancy property would have gone to the husband, and in event of intestacy the community property would have been his. (Prob. Code, § 201.) There would have been only the relatively small separate property of the wife, of which but one third would have gone to the daughter. (Prob. Code, § 221.)

Nor is there evidence that testatrix' complaint that her daughter had not visited her for many years was untrue. A few letters between mother and daughter were put into evidence. The mother did have affection for her daughter, but in one of the letters the mother chides her daughter for delay in writing. Most of the letters in the record which came from the daughter are dated subsequent to the will and would not have a bearing on the mother's reproach about the lack of visits. Testatrix had lived from time to time with respondent and his wife. ▇▇▇ We do not find enough evidence of undue profit to have sustained the presumption, and without the presumption the issue of undue influence could not properly have been submitted to the jury.

### Asserted Errors

▇▇▇ Appellant argues that the judge was abrupt and somewhat hostile to him. We have examined all of the instances cited in the brief and we find that the judge was merely trying to keep both counsel in a rather spirited contest from arguing the case as the evidence was going in. Appellant objects in particular to the warning which the judge gave to the jury that the fact that testatrix had been placed in a psychiatric ward (in February 1963) does not support an

inference of mental illness, was gratuitous. But the admonition was correct. (*Estate of Arnold, supra,* 16 Cal.2d 573, 585-586; *Estate of Nelson, supra,* 227 Cal.App.2d 42, 56-57.) Appellant's assertion that two instructions are highly confusing is without merit. One of them says that the contestant must prove lack of testamentary capacity at the very time of execution; which is correct. The other is that unsoundness of mind at the very time of execution may be reasonably inferred from unsoundness of mind existing either before or after that time; which is also correct.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.

A petition for a rehearing was denied August 11, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 27, 1967.