Filed 3/16/22  Gregge v. Hugill CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| EDWARD B. GREGGE, | H045113 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-12-PR-170606) |
| v. | |
| MICHAEL HUGILL, as Trustee, etc., | |
| Defendant and Respondent. | |

William Hugill died in November 2011.  He was 94 years old and survived by four children and seven grandchildren.  In 2012, one of his grandchildren, appellant Edward Bennett Gregge (Bennett), filed a petition under Probate Code section 17200 to determine the validity of a 2008 amendment to William's trust.[1]  The petition was denied after a six-day court trial.  Sitting in probate, the trial court found appellant failed to establish that William lacked testamentary capacity or was unduly influenced by respondent Michael Hugill (William's son and appellant's uncle) at the time the amendment was executed.

Bennett argues on appeal that the trial court applied the wrong mental capacity standard and made erroneous factual findings.  As we will explain, the trial court correctly applied the testamentary capacity standard, and the evidence does not compel a finding in Bennett's favor that William lacked capacity to execute the amendment. Bennett has failed to demonstrate reversible error, and we will affirm the judgment.

_____

[1] Because this case involves several family members, many sharing the same surname, we will use first names to avoid confusion, intending no familiarity or disrespect.

## I. BACKGROUND

William Hugill and his wife Janice executed an inter vivos trust in 1990, with William serving as trustee. Pursuant to the terms of that trust, two separate trusts were established when Janice died in 1996—the decedent's irrevocable trust and the survivor's amendable and revocable trust, both of which would terminate upon the death of the survivor. After disbursement of certain personal property, 30 percent of the remainder of the survivor's trust would be distributed in equal shares to William's four children, Patrick, Michael, Marjorie, and Holly. The other 70 percent would be set aside in a grandchildren's trust for college educations, with the remainder of that subtrust to be divided among William's children (30 percent) and grandchildren (70 percent) after the youngest grandchild turned 26. Michael was named as a successor trustee to Marjorie.

In 1997, William amended the survivor's trust, designating a fixed sum to fund the grandchildren's trust. He reallocated the estate residue among his four children, reducing Michael's share to five percent. (Thirty-five percent was to be disbursed to Holly who was disabled; and Patrick and Marjorie each would receive 30 percent.)

In 2000, William amended the survivor's trust to eliminate Michael's five percent residual share (Patrick's share was increased by that percentage). In 2001, William removed Michael as successor trustee and removed Michael's children, Kathleen and Cameron, as beneficiaries of the grandchildren's trust. William restored the grandchildren's status one year later, but again removed Cameron as a grandchildren's trust beneficiary in 2005. He also divided the grandchildren's trust into equal shares for his six other grandchildren, to be distributed—half to the grandchild and half to the grandchild's parent who is William's child—when each grandchild turned 26, except that Kathleen's share would be distributed equally to Patrick, Marjorie, and Holly.

William executed a final amendment to the survivor's trust on June 5, 2008, two weeks after he underwent surgery to remove two subdural hematomas. The 2008 amendment, at issue here, restored Michael as a trust beneficiary on equal footing with

2

his siblings, and it restored Cameron as a grandchildren's trust beneficiary on equal footing with his sister and cousins. Michael was designated as the first successor trustee, and he assumed that role in late 2009 when William resigned the position. William died in November 2011. According to a May 2012 accounting filed in the Santa Clara County Superior Court, the trust estate approximated $4.9 million.

Shortly after the accounting was filed, Holly's son Bennett filed a petition under Probate Code section 17200 to determine the validity of the June 5, 2008 amendment. Bennett alleged that William lacked testamentary capacity and was unduly influenced by Michael at the time he executed the amendment, and that Michael unduly benefited from the disposition of the trust estate and from his appointment as successor trustee. The petition also alleged that Michael had deprived William of proper medical care in 2009 and 2010. The petition sought a determination that the 2008 amendment was void due to lack of testamentary capacity and undue influence.

The petition was denied after a six-day court trial. In a 22-page statement of decision, the court found Bennett failed to establish that William lacked testamentary capacity or was unduly influenced by Michael at the time he executed the 2008 amendment. According to the statement of decision, after Michael and his wife (whom William disliked) separated in 2005, Michael and William reconciled, and in 2007 William told Marjorie he was going to amend the survivor's trust to restore Michael as a beneficiary of the trust residue. In March 2008, William told Michael he was going to amend the survivor's trust "to make everything equal again." He asked Michael to serve as executor of his estate, and said he would have his attorney make the necessary changes.

In mid-May 2008, William fell at home in Rancho Mirage and suffered a subdural hematoma. He admitted himself to a nearby hospital on May 19. Michael and Holly arrived at the hospital on May 21, at which time William asked Michael to call his estate planning attorney in Los Angeles to amend the survivor's trust "to make everything

3

equal." Michael placed the call, explained the situation, and put William on the phone. The attorney, who was in the midst of a trial, found William unintelligible and suggested that Michael contact a local attorney to handle the matter.

Michael met with a local attorney on May 22. Michael explained that William wanted to change his trust to make everything equal again and wanted Michael to serve as his executor. The local attorney later spoke with William's Los Angeles attorney. He also visited the hospital, where William, who was scheduled for surgery the next day, confirmed to him that he wanted to amend the survivor's trust to distribute the residue equally to all his children and distribute the grandchildren's subtrust equally to his grandchildren. William also confirmed that Michael was to be in charge, and Holly was to keep a house she and William owned as joint tenants. The attorney confirmed that William responded clearly on each point. The attorney concluded that William had testamentary capacity and was free from undue influence, and he drafted the estate planning documents. He returned to the hospital that evening. After speaking to a nurse who reported that William was " 'not awake, alert and orientated,' " and with Michael's agreement, the documents were not presented to William for signature. A social worker also advised Michael that documents should not be executed at William's bedside under the circumstances. The social worker described Michael as very agreeable, amicable, and not pushy.

William underwent surgery on May 23, and medical records showed two blood clots were successfully removed. Hospital records show William on May 25 awake and alert, with " 'some expressive aphasia, i.e., inability to speak fluently.' " He was discharged from the hospital to an acute rehabilitation facility on June 2.

Physician notes from June 3 showed William " 'awake and alert,' " with " 'significant expressive aphasia' associated with the blood clot." On June 4 William asked Michael about the paperwork to amend his estate plan. Michael told William the documents were ready to be signed and notarized, and William said " 'Let's get this thing

4

done.' " On June 5, William signed the 2008 trust amendment and a codicil to his 2000 will in the presence of a notary, two friends, and Michael. The next day he signed an amended codicil which included a clause mistakenly omitted from the initial codicil nominating Michael in first position to serve as William's executor. William was discharged from the rehabilitation facility later that month.

In August 2008, William flew to Paris where he met a friend. Together, they travelled for several weeks in Ireland and France. William dined with Michael and Michael's son Cameron upon his return to Los Angeles. William spent Thanksgiving in 2008 with Michael, Marjorie, and Holly. In December 2009 William resigned as trustee and Michael assumed the position. In the almost three years between executing the 2008 amendment and his death, William neither amended the trust nor expressed a desire to do so.

The trial court found that that Bennett failed to meet his burden to prove lack of testamentary capacity at the time William executed the 2008 amendment. Quoting *Marriage of Greenway* (2013) 217 Cal.App.4th 628, 639–642, the trial court recognized that the testamentary capacity standard under Probate Code section 6100.5 "is exceptionally low," and that "even hallucinations and delusions do not demonstrate lack of capacity if they are not related to the testamentary act." The trial court found that Bennett failed to raise a presumption or prove that William was unduly influenced by Michael. It also found Bennett failed to prove that William was the victim of elder abuse.

## II. DISCUSSION

### A. MENTAL CAPACITY GENERALLY

Bennett argues the trial court erred by applying the Probate Code's testamentary capacity standard to the trust amendment instead of the code's sliding scale mental capacity standard described in *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346 (*Lintz*). We review de novo this predominantly legal question. (*Holmes v. Jones* (2000) 83 Cal.App.4th 882, 888 [a trial court's interpretation of statutes and legal conclusions

5

are reviewed de novo]; *International Alliance of Theatrical Stage Employees, etc. v. Laughon* (2004) 118 Cal.App.4th 1380, 1387 [statutory interpretation and application subject to independent review].)

The general rules for assessing mental capacity begin with Probate Code section 810, which establishes a rebuttable presumption "that all persons have the capacity to make decisions and to be responsible for their acts or decisions." (Prob. Code, § 810, subd. (a). Unspecified statutory references are to this code.) The statute recognizes that persons with mental or physical disorders "may still be capable of contracting, conveying, marrying, making medical decisions, executing wills or trusts, and performing other actions." (*Id*., subd. (b).) Under section 811, a person lacks capacity to decide or act when there is a deficit in at least one identified mental function and "a correlation [exists] between the deficit or deficits and the decision or acts in question." (§ 811, subd. (a).) A mental function deficit bears on capacity if it "significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (*Id*., subd. (b).) Section 812, which excepts itself from *testamentary* capacity determinations, states that "a person lacks the capacity to make a decision unless the person has the ability to communicate ... the decision," and to the extent relevant, to understand and appreciate: the "rights, duties, and responsibilities created by, or affected by the decision"; the "probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision"; and the "significant risks, benefits, and reasonable alternatives involved in the decision." (§ 812, subds. (a)–(c).)

In contrast to the sliding scale rubric described above, Probate Code section 6100.5 "contemplates a significantly lower mental capacity standard for the making of a will." (*Lintz, supra*, 222 Cal.App.4th at p. 1351.) A person is competent to make a will when he or she understands "the nature of the testamentary act;" understands and recollects "the nature and situation of [his or her] property"; and remembers and

6

understands his or her "relations to living descendants, spouse, and parents, and those whose interests are affected by the will." (§ 6100.5, subd. (a)(1)(A)–(C).) The statute provides that a person suffering from a mental health disorder "with symptoms including delusions or hallucinations" lacks capacity to make a will if the delusions or hallucinations result in the individual devising property in a way that the individual would not have done except for the existence of the delusions or hallucinations. (*Id*., subd. (a)(2).)

The court in *Anderson v. Hunt* (2011) 196 Cal.App.4th 722 (*Anderson*) concluded that section 6100.5 informs a trustor's capacity to execute an amendment that, "in its content and complexity, closely resembles a will or codicil." (*Anderson,* at p. 731.) Section 6100.5 bears on whether, under section 811, subdivision (b), "a person's mental deficits are sufficient to allow a court to conclude that the person lacks the ability 'to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question.' " (*Anderson*, at p. 731.) Section 6100.5 is thus "made applicable through section 811 to trusts or trust amendments that are analogous to wills or codicils." (*Anderson*, at p. 731.) The original trust document in *Anderson* was complex. But the amendments, which added, dropped, and reallocated the trust residue among several beneficiaries, were not. (*Ibid*.) The appellate court concluded that the amendments were indistinguishable from a will or codicil in that they were simple and testamentary in nature. (*Ibid.*) The decedent's capacity to execute the amendments therefore should have been evaluated under the lower testamentary capacity standard set forth in Probate Code section 6100.5. (*Anderson*, at p. 731.)

Adopting the reasoning in *Anderson*, the court in *Lintz* recognized that the capacity to make an after-death transfer by trust is evaluated by the complexity as opposed to the nature of the testamentary act. (*Lintz*, *supra*, 222 Cal.App.4th at pp. 1351–1352.) The trusts and trust amendments in *Lintz* "addressed community property concerns, provided for income distribution during the life of the surviving

7

spouse, and provided for the creation of multiple trusts, one contemplating estate tax consequences, upon the death of the surviving spouse." (*Id*. at p. 1353.) The sliding-scale contractual standard set forth in Probate Code sections 810 through 812 applied to those instruments because they were "unquestionably more complex than a will or a codicil." (*Lintz,* at pp. 1352–1353.)

William's 2008 trust amendment was not complex. Similar to the amendments in *Anderson*, it merely reallocated the percentage of the grandchildren's subtrust and the trust residue so that William's children and grandchildren, respectively, took equal shares of his estate. The trial court was thus correct in applying the lower testamentary capacity standard to the 2008 trust amendment.

Bennett argues that the amendment was complex (and William lacked capacity to execute it under the standard applied in *Lintz*) because the amendment did not revoke the third amendment to the restated survivor's trust executed in 2005, and thus did not actually result in Michael sharing equally in William's estate. The 2005 amendment provided that upon the termination of each grandchild's share of the grandchildren's subtrust (i.e., when the grandchild turned 26), half of the grandchild's then-remaining share would be distributed to that child's parent, except that half of the then-remaining share for Michael's daughter Kathleen would be distributed not to Michael but equally among William's other children. The fact that the 2008 amendment did not acknowledge the third amendment to the restated trust and thus presumably did not alter the provision in the third amendment related to the distribution of Kathleen's share of the grandchildren's subtrust does not show that the 2008 amendment was complex or unfair or otherwise compel an incapacity finding.

**B. TESTAMENTARY CAPACITY UNDER PROBATE CODE SECTION 6100.5**

Bennett argues William lacked testamentary capacity to execute the trust amendment under Probate Code section 6100.5. He argues that on May 22 and June 5, William did not remember facts such as Michael's name, that Patrick was his oldest son,

8

or that Holly was disabled.  Bennett argues that he presented "ample evidence" that William lacked testamentary capacity, and the statement of decision is "erroneous and contrary to overwhelming, undisputed evidence."

Significantly for our review, where " 'the issue on appeal turns on the failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Juen v. Alain Pinel Realtors, Inc*. (2019) 32 Cal.App.5th 972, 978–979.)  In reviewing a judgment based on a statement of decision following a bench trial, " 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' " (*In re Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.)  The reviewing court may not reweigh the evidence and is bound by the trial court's credibility determinations.  (*Id*. at p. 76.)  Here, the trial court "resolve[d] all credibility issues in favor of its findings and determinations," and where different inferences could be drawn from the evidence, it found "most credible those inferences which support [its] determination."

Bennett has failed to show reversable error under our standard of review.  He cites to his experts' testimony and medical records, which include notes from doctors, nurses, physical therapists, occupational therapists, and speech therapists.  But the trial court found that Bennett's experts were unhelpful.  The court found that the evidence did not show that "William's alleged cognitive impairments were so debilitating that he could not remember his issue, recollect his property, and understand that he wanted to treat his children and grandchildren equally."  Nor did the evidence show "any cognitive impairment suffered by William caused him to devise his estate equally to all of his

9

children and grandchildren, instead of disinheriting his son Michael and his grandson Cameron."

We briefly discuss the medical records and the opinion of Michael's expert Dr. Mueller, a medical doctor trained in psychiatry and neurology, to explain that the evidence Bennett relies on was not uncontradicted and unimpeached. Nor was the evidence of such a character and weight to compel a finding in Bennett's favor. Michael's expert read the depositions of Michael, Holly, Bennett, the Los Angeles and local attorneys, the hospital social worker, William's treating surgeon, the rehabilitation facility's medical director, and Bennett's two medical experts. He also reviewed William's medical records, and opined that neither the depositions nor the records showed that William lacked testamentary capacity on June 5. According to the medical records, William's fall led to his hospitalization, when expressive aphasia was observed in the emergency room and by the treating neurologist. The neurologist noted that William "fell out of bed approximately four days ago with no reported loss of consciousness." He states that William "developed slurred speech and difficulty finding words today." Michael's expert described aphasia as "a language disturbance, that prevents [William] from saying the word that he wishes to say." Over the course of his hospital stay, William showed symptoms of a "mixed aphasia, namely he had problems not only with spontaneity and fluency of speech but also with comprehension, and most evidently, with word finding difficulty."

Day shift nursing notes from June 4 described William as alert and oriented and using single words. The June 4 night shift and June 5 day shift nursing notes described William as alert and oriented with clear speech. Michael's expert explained that William had a resolving aphasic disorder at that time; the aphasia made it "difficult or impossible to assess memory [and] reasoning in any adequate way"; and neither the hospital nor rehabilitation facility attempted to administer even a rudimentary cognitive screening test.

10

Michael's expert testified that many occupational and speech therapists "will confuse recognition and naming of a person," and he questioned whether the words "recognition" and "memory" were appropriately used in their notes, "when an alternative and more parsimonious explanation is 'man had word-finding difficulty of an aphasic nature.'" Occupational therapy progress notes from June 5 state that William "exhibited difficulty recalling son's name." The expert opined that William was having word-finding difficulty at that time. On May 22, a nurse attending to William asked him several questions, including "[W]here are you now?" William responded, "The moon – no – I live here."[2] The expert opined that William's reference to "the moon" was a "paraphasic distortion of spoken language." He also explained that even if a person actually believes he is on the moon, that belief "doesn't necessarily prevent him from knowing what property he owns or what it's worth or what he wants to do with it."

In Dr. Mueller's opinion, changing a trust to reinstate a son as a beneficiary so that all children and grandchildren are on equal footing is not a complex task; William "had the ability to know whether he wanted his son Michael in or out"; William had expressed on several occasions that he wanted to divide his estate equally among his children and grandchildren with the exception of a house for Holly; and nothing in the medical records prevented William from deciding to reinstate Michael.

Bennett argues that the statement of decision misrepresented or fabricated evidence. He points to a litany of findings purportedly contradicted by evidence or omissions in the record. For example, the finding that in 2007 William told Marjorie he would amend the survivor's trust to restore Michael as a beneficiary was contradicted by the fact that William did not instruct his attorney to execute an amendment before he was

---

[2] The nurse also asked William: [Q.] "Is this a hospital?" [A.] "Oh, yes, I can't say the name." [Q.] "Why did you come to the hospital?" [A.] "I had some trouble. It hurt." [Q.] "Did your doctor talk to you about surgery?" [A.] "Oh yes." [Q.] "Do you know where on you the surgery will be?" [A.] "Oh, yes. Here – a lot of trouble only here" (pointing to his right face).

hospitalized in May 2008; the finding that William asked Michael to call his attorney in Los Angeles to amend the estate planning documents contradicts the finding that the same attorney found William to be unintelligible; and the finding that the local attorney drafted the estate planning documents in accordance with William's request contradicts the finding that Michael instructed that attorney to change the estate plan. Those findings are not inherently contradictory, nor do they establish grounds for reversal.

Bennett argues the statement of decision misrepresented the deposition testimony of William's Los Angeles attorney because it referred to the attorney's notes from 2006 that Michael and William had met and were trying to reconcile their differences, without mentioning the attorney's notes from 2001 when William sought to disinherit Michael and Michael's children. Bennett complains that other findings misstated or mischaracterized medical records; the local attorney's deposition; the social worker's deposition; the testimony of William's friend William Porter; and Michael's trial testimony.

We have carefully reviewed the record and see no misrepresented or fabricated evidence. Rather, it is Bennett who takes liberties with the record. For example, Bennett asserts that Michael's expert "admitted" that at the time William executed the amendment William "did not know what a trust was." The expert testified that William could not have *explained* what a trust was on May 22 because of his aphasia, not that there was a lack of understanding. Bennett attacks the finding that Porter was present when William signed the amendment as "a blatant misstatement of Porter's trial testimony." But Porter, William's good friend and neighbor, testified that he or his wife visited William every day when William was hospitalized; he visited William almost every day when Willian was in rehabilitation; and on two consecutive days in June he saw William sign papers with a notary and witness present. On cross-examination Porter said the year was 2007, but then clarified that he was not sure of the year, but the dates were either June 5 and 6 or June 6 and 7, "[b]ecause I was at the hospital with [William] those days."

12

Bennett points out that the statement of decision incorrectly quoted a June 26 discharge summary from the rehabilitation facility to describe William's condition on June 2 when he was discharged from the hospital to rehabilitation. The summary stated that William "required minimal assistance for memory, supervision with problem solving, and he is modified independent for social interaction," and he "was discharged home in stable condition." The reference appears to be a mistake, not a fabrication as Bennett argues, and it does not undermine the trial court's reasoning or ultimate conclusions. The trial court went on to accurately quote from June 3, 4, and 5 medical notes to describe William's condition in the days leading up to his executing the trust amendment on June 5.

The trial court also mistakenly quoted emergency department records from February 21, 2009 when describing William's mental state on May 21, 2008, the date on which William signed a hospital form naming Michael as his agent to make health care decisions for him. The 2009 emergency department records note: "Normal psychiatric evaluation in this elderly male. Normal interpersonal interactions[,] appears functionally intact and deals appropriately with others." Physician notes from May 20, 2008 describe William as "alert but occasionally confused with dysphasia." Patient care notes over the course of May 21, 2008 state that William "remains with expressive aphasia; oriented to self; some intermittent confusions"; William's "ability to express self [is] much better"; and William is "awake, alert. Answers some questions appropriately but has expressive aphasia." Here again, we acknowledge the trial court's erroneous factual reference but based on the correct records from May 21, 2008, the mistake does not compel a different result.

Bennett challenges what he characterizes as a "finding" that William had testamentary capacity "because he did not later amend his trust." (Boldface and capitalization omitted.) In its testamentary capacity analysis, the trial court found significant that William had modified his trust several times, because those past acts

13

demonstrated that William was familiar with the process that occurred on June 5, and if he had been dissatisfied, he could have again changed the trust. And the trial court did not determine that Bennett had failed to meet his burden on that basis alone. The court also stressed the absence of insanity to establish incompetency generally, noting William's ability to live independently and travel both before and after the June 5 amendment. It noted the absence of hallucination or delusion at the time William signed the amendment, and his correcting a typographical error in the amendment's spelling of his deceased wife's surname, striking out the second "g" in "Huggill." The court also relied on Porter's testimony that William was strong willed and stubborn, and intelligible and able to talk about golf scores on June 5 and 6. Porter witnessed William sign the amendment and saw nothing unusual.

## C. UNDUE INFLUENCE

The presumption favoring a will may be countered by a presumption of undue influence brought to bear on the testator. (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605.) The presumption of undue influence arises where a confidential relationship exists between the testator and the party alleged to have exerted influence, and there is "activity" on the part of the beneficiary in the procurement of the will and "undue profit" to that beneficiary. (*Estate of Goetz* (1967) 253 Cal.App.2d 107, 115, 117 (*Goetz*)) The trial court found that Bennett failed to establish the second and third elements of the undue influence presumption.

Bennett argues that the "activity" element is satisfied as a matter of law by Michael contacting, hiring, and instructing the local attorney; collecting the existing estate planning documents from William' s home for the local attorney; being present when the local attorney returned to the hospital with the documents for William to execute; and facilitating the June 5 signing without an attorney or Holly present and without anyone explaining the amendment to William. But the activity needed to satisfy the presumption is not any activity but "noxious" activity. (*Goetz*, *supra*, 253 Cal.App.2d

14

at p. 117.) The court in *Goetz* explained that the element is not satisfied where a beneficiary speaks with the testator about testamentary intentions; accompanies the testator to a lawyer's office to instruct on drafting a will or to execute the will; remains in the office during the will's execution; or opts not to take the testator to a psychiatrist to pass on the testator's competency. (*Id.* at pp. 116–117). The activities Bennett cites are similar to those in *Goetz* and are not noxious under the law. Further, there is no requirement that someone explain the documents to William before signing.

We also agree with the trial court that Michael did not unduly profit from the amended trust, where he and his son were merely reinstated as beneficiaries to share equally with their respective siblings. (*Goetz, supra*, 253 Cal.App.2d at pp. 117–118 [the natural disposition of property is inconsistent with undue profit].) The record does not demonstrate, much less compel, a finding of any " 'pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency.' " (*Lintz, supra*, 222 Cal.App.4th 1346, 1354, quoting *Rice v. Clark* (2002) 28 Cal.4th 89, 96.)

### D. DELIVERY REQUIREMENT

Bennett argues that the 2008 amendment is invalid under California law and the terms of the trust itself because Michael did not leave a copy of the document with William after William signed it. Bennett has forfeited this claim by failing to raise it to the trial court. The argument fails even if it had been preserved. The Probate Code provides that a revocable trust may be revoked either by complying with the method of revocation provided in the trust instrument or by a writing signed by the settlor "and delivered to the trustee during the lifetime of the settlor." (§ 15401, subd. (a)(1)–(2).) The Fourth Amendment and Restatement of the Trust executed in February 2000 states that the trustor may revoke or amend the trust by a written instrument "signed by the Trustor and delivered to the Trustee."

15

The amendment is not invalid for lack of delivery to the trustee. Michael testified that he did not leave a copy of the trust amendment with William at the hospital upon signing. But William had received the trust amendment when he executed the document as "Trustor and Trustee," thereby satisfying the delivery requirement. Michael also provided William's Los Angeles attorney with the amendment.

## E. ELDER ABUSE CLAIMS

Bennett's petition alleged that Michael failed to obtain care and medicine for William in 2009 and 2010. The trial court found that Bennett did not have standing under Welfare and Institutions Code section 15657.3 to bring an elder abuse claim, but even if he did, Bennett did not prove elder abuse. Bennett argues the standing ruling is contrary to the law of the case from his previous appeal, *Gregge v. Hugill* (2016) 1 Cal.App.5th 561, where this court held that the trial court had initially abused its discretion by dismissing Bennett's petition based on a nonparty (Michael's son) disclaiming his interest in the trust estate (*id.* at pp. 569–571), and that Bennett had standing as an interested person under Welfare and Institutions Code section 15657.3, subdivision (d)(2). But even with standing, he fails to demonstrate error. The trial court alternatively found Bennett's elder abuse allegations meritless. In his reply brief Bennett presents his version of events leading up to June 5, 2008 to argue that Michael committed elder abuse in orchestrating the drafting and signing of the amendment to the survivor's trust. Overlooking the fact that Bennett alleged elder abuse occurred only in 2009 and 2010, the trial court rejected Bennett's version of events, and the record before us does not compel an elder abuse finding as a matter of law.

## III. DISPOSITION

The judgment is affirmed. Respondent shall recover his costs on appeal by operation of California Rules of Court, rule 8.278(a)(1).

16

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Danner, J.

**H045113 -** *Gregge v. Hugill et al.*