[Civ. No. 14797. First Dist., Div. Two. Jan. 14, 1952.]

Estate of SILVIO RUGANI, Deceased. FOSCO RUGANI et al., Respondents, v. DOROTHY CUNNINGHAM LEONOFF, Appellant.

Theodore M. Monell for Appellant.

Hoberg & Finger, J. A. Pardini, Elda Granelli and B. Campagnoli for Respondents.

JONES, J. pro tem.—This is a proceeding in which the contest of a will was consolidated for trial with an action to cancel two deeds. Two sets of findings were made by the trial court and two judgments entered. For the purpose of this appeal the findings will be considered as a single set, and the two judgments as but one. (*People* v. *Ocean Shore R., Inc.*, 22 Cal.App.2d 657 [72 P.2d 167]; *East Bay Mun. Utility Dist.* v. *Kieffer*, 99 Cal.App. 240 [278 P. 476, 279 P. 178].)

The two children of the decedent, Rugani, filed the contest to his alleged will. Upon the trial they abandoned their other grounds of contest and relied solely upon that of undue influence. The court found in their favor and entered a decree denying the will admission to probate. The children are also the plaintiffs in the action to cancel the two deeds. The deeds were also attacked upon the ground of undue influence and upon the additional ground that they had never been delivered. The trial court found in favor of the children of the decedent upon both of these issues and entered a decree declaring the deeds void. The proponent of the will, who is also the grantee named in each of the deeds, filed this appeal.

The record shows that Rugani came to this country from Italy in 1912. The evidence does not disclose whether his first wife died before he left Italy or after he arrived here. In any event his two children by his first marriage, Fosco Rugani, a son, and Leonetta Rugani Peschiera, a daughter, remained in Italy. His second wife, and by which marriage there were no children, died a little less than a year before he did. Her death was on March 10, 1948, and he died on February 21, 1949. Mrs. Rugani's estate was still in probate on the date when the will and the deeds in question here were alleged to have been executed.

Rugani was illiterate and could speak only broken English. Among the witnesses who testified as to his illiteracy were W. J. McChrystle, his attorney in the matter of the probate of his wife's estate, W. R. Collum, manager of the Safe Deposit Department at the Crocker First National Bank, under whom Rugani worked as a porter, and Mrs. Myrtle E. Noah. Mrs. Noah had been a tenant in the Rugani house before Mrs. Rugani's death, and after her death she continued on. She testified that: "He (Rugani) could not read; he read the pictures, as far as reading was concerned by his own admission he had no education in Italy or in the United

States; he could not read or write. All that he—his reading was mostly to find a picture, that he spelled out, deciphered out; as far as writing was concerned he signed his name; that was simply from memory.''

Mr. Collum gave testimony that Rugani could neither read nor write, except that he could write his name. For a period after Mrs. Rugani's death it was Rugani's custom to bring all business correspondence to him for explanation. Collum would then follow Rugani's directions as to what should be done. Much of this had to do with the probate of Mrs. Rugani's estate and many of the explanations were of legal documents. McChrystle testified that when he addressed communications to Rugani the reply usually came through Mr. Collum. Rugani never read any of the documents pertaining to the probate of his wife's estate in McChrystle's presence but would, after explanation of the document under consideration, sign it without reading it. He never wrote anything except his name in McChrystle's presence.

At the date of his death Rugani was 62 years of age. For several years he had been suffering from a heart affliction, the exact nature of which the record does not disclose. Mrs. Rugani was apparently in better health than her husband and her sudden death was a pronounced shock to him.

The proponent of the will, Mrs. Dorothy Cunningham Leonoff, was some 25 years younger than Rugani. She had married a man by the name of Cunningham in 1930. In 1940 she married one Constantine Leonoff, and at the time of the trial she was engaged to marry one Harry Selleneit. She was known to some of her friends as Mrs. Cunningham, but to most of them she was known as Mrs. Leonoff. She met Rugani in 1939. The testimony is conflicting as to whether she met him in a coffee shop at the rear of the bank where he worked, or whether their first meeting was in a tavern. By vocation she was a legal secretary. The evidence discloses that she kept her own file of legal forms including forms of wills and deeds as well as particular paragraphs and wordings for special provisions therein. She also had her own typewriter.

Mrs. Leonoff was acquainted with Mrs. Rugani and on one or two occasions had visited in the Rugani home prior to Mrs. Rugani's death. After her death she frequently had lunch or dinner with Rugani. According to her testimony, on one of these occasions he suggested that she move into

his home. She also testified that when he told her that he would leave all of his property to her she made up her mind to accept his invitation. This was at a luncheon on her birthday on September 4, 1948, in the home of one Mrs. O'Shea.

On October 1, 1948, she and Mrs. MacPherson, one of the witnesses to the will, moved all of her belongings into the Rugani house. Mr. Rugani was not there when she arrived but they took charge and she was all settled by the time he came home. This was about 3:30 o'clock in the afternoon. Rugani immediately went upstairs and soon came back with a metal box from which he took some documents embodying the descriptions of his property in San Francisco and in Sonoma County. Mrs. Leonoff took a position at her typewriter and using her file of forms drafted the will in question here. She also drew the two deeds from him to her of the San Francisco and Sonoma County properties and wrote two letters to different life insurance companies for him to sign. These letters contained the direction that she be made the beneficiary under his two life insurance policies. In addition she drafted her own will naming Rugani as the sole legatee thereunder. A Mrs. Price, another close friend of Mrs. Leonoff, who had already been notified that she would be needed, was summoned by telephone to act as the other witness to the wills. After the wills were signed and witnessed, the four, Mrs. Leonoff, Mrs. MacPherson, Mrs. Price and Rugani went to the city hall where the deeds were signed by Rugani and acknowledged before a notary public, another acquaintance of Mrs. Leonoff. This being done, the four returned to Rugani's home. The two deeds had been placed in an envelope upon which was endorsed the instruction: "To be opened at my death."

With reference to the deeds, Mrs. Leonoff testified: "Q. What happened to the deeds after you got back home? A. He put them in the little box; he took me upstairs; he had a cedar chest at the foot of his bed which had a lock although the little box did not. He handed me the box and handed me the keys and opened up the chest. He said 'Put that in there; if anything—if anything happens to me take it to the City Hall.' "

Changes, alterations and repairs were made to the Rugani house under the supervision and direction of Mrs. Leonoff after she moved in. Mrs. Noah was moved out and Mrs.

Leonoff and Rugani occupied the place alone. While living there they made frequent trips to his summer cottage near Guerneville on the Russian River. There they became acquainted with a Mrs. Doyle who, when called as a witness for the proponent, testified:

"Mr. Finger: Q. Mrs. Doyle, you say that Mr. Rugani always said that he regarded Mrs. Leonoff as a very competent person? A. Yes; he respected her intelligence; he looked up to her by reason of her intelligence.

"Q. Isn't it a fact also that he also said that he had the utmost confidence in her? A. Yes.

"Q. Did they give the appearance of being two people who shared each other's full confidence? A. Yes, they did.

"Q. They did. Did he tell you that as long as he had known Dorothy he had regarded her as a friend? A. Yes.

"Q. Had placed great confidence in her? A. Yes."

After he made his will Rugani's health declined steadily. A day or two before his death he took to his bed and was later removed to a hospital by Mrs. Leonoff where he passed away early on the following morning. Mrs. Leonoff recorded the deeds to the San Francisco property before noon on the day of Rugani's death and on the same date deeded this property to Harry Selleneit. On February 23, two days after Rugani died, she recorded the deed to the Sonoma County property and immediately thereafter executed a deed to this property to her uncle.

On the day that the deed to the Sonoma County property was recorded she visited the Crocker Bank and by appointment there met Mr. Collum and Mr. McChrystle. To these men she voluntarily stated as testified to by Mr. Collum: "That Mr. Rugani had left everything to her in a will; had given her gift deeds—deeds of gift to the real property. She made the statement: 'I had it transferred very fast, to get those deeds in and out of my name to avoid creditors.' She mentioned that he had left a will. She acted kind of surprised—she said—'Oh, yes, he had gone to the avenue and procured the forms, and he had gone down to the City Hall with two neighbors who were not friends of mine and had these papers executed and when he came back he handed me the sealed envelope, and he said, "This is yours." ' " In explanation of these statements the appellant testified that she could not

without embarrassment have stated before Rugani's attorney that the will and the deeds had been prepared by her.

In *Estate of Leonard,* 92 Cal.App.2d 420, 429 [207 P.2d 66], the rule governing situations such as is here presented is stated to be that, ''Where a person sustains a confidential relation to the testator, is active in the preparation of a will and unduly profits by its terms, a presumption of undue influence arises casting the burden of showing that the will was not the product of undue influence upon the proponent of the will,'' citing *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]; *Estate of Hull,* 63 Cal.App.2d 135 [146 P.2d 242]; *Estate of Abert,* 91 Cal.App.2d 50 [204 P.2d 347]. The presumption created by the combination of these three elements is in itself a species of evidence which the proponent must overcome before she can prevail. It is said in *Khoury* v. *Barham,* 85 Cal.App.2d 202, 212 [192 P.2d 823]: ''This presumption is evidence.. Standing alone it supports a finding against contradictory evidence by plaintiff. (*Lieber* v. *Rigby,* 34 Cal.App.2d 582, 584 [94 P.2d 49].) It was for the trial court to say whether the evidence offered by the plaintiff outweighs the presumption.'' (Citing cases.) And in *Estate of Teel,* 25 Cal.2d 520, 526 [154 P.2d 384], it is said: ''The trier of fact is the sole judge of the credibility and weight of the evidence in a will contest the same as in any other case.'' (Citing numerous authorities.) The rule, of course, is that if there is any substantial evidence from which a legitimate and reasonable inference to support it may be drawn, the finding of the trial court must be upheld on appeal. In *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689], this rule is expressed as follows: '' 'It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict.''

Our problem here is somewhat narrowed by the fact that the appellant is disputing only one of the elements upon

which the presumption is based. She makes no point that she was not active in the preparation of the will or the deeds, nor does she contend that she would not stand to profit unduly if either were upheld. The sole ground for reversal urged by her is that the evidence is insufficient to support the finding of undue influence because, as she contends, it does not establish a confidential relationship.

In *Estate of Cover*, 188 Cal. 133, 143 [204 P. 583], it is said: "Confidential . . . relations . . . may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another." This definition is restated in *Estate of Arbuckle*, 98 Cal.App.2d 562, 569 [220 P.2d 950], which cites in addition to *Estate of Cover, supra, Hemenway* v. *Abbott*, 8 Cal.App. 450, 463 [97 P. 190], and 37 Corpus Juris Secundum 214, section 2c(2). In applying the above mentioned standard of what is necessary to make out a case of confidential relationship the court in the case of *Steinberger* v. *Steinberger*, 60 Cal.App.2d 116, 123 [140 P.2d 31], in which a hearing was denied by the Supreme Court, said: "In the instant case the trial court found that Earle and his uncle William stood in a confidential relationship to each other. This finding is amply supported. There is not only the evidence of the status of uncle and nephew, and of cotenants, but there is ample evidence to show that a confidential relationship in fact existed. The respondent testified that he had trust and confidence in his uncle. The evidence shows that Earle and William lived in the house on the property here involved from the time of Earle's birth; that the uncle gave Earle money when he needed it, and that Earl reciprocated; . . . that the uncle frequently stated he was keeping and holding the home for the boys. The evidence shows a *friendly intimate relationship* existed between Earle and his uncle. From this evidence it is apparent that the finding of confidential relationship is amply supported." (Italics added.) The cited cases are to the effect that a confidential relationship exists whenever trust and confidence is reposed by one person in the integrity and fidelity of another, and that such relationship is a fact to be established in the same manner and by the same kind of evidence as any other fact is proven

▮▮▮ In the case before us we have a person of Italian birth, without the ability to read or write, and who could speak only broken English. He was advanced in years and was

suffering from a heart ailment of which he died about four months after the alleged will was made. He was alone in the world, except for his children in Italy, and dependent entirely upon friends for advice and comfort.

He had known Mrs. Leonoff for several years prior to his wife's death. And, after her death, the intimacy of their relationship built up until she moved into his home. It is reasonable to infer that he found solace in her companionship before as well as after she moved into his house. They frequently made trips together to his summer cottage in Sonoma County. He told Mrs. Doyle, a close acquaintance of Mrs. Leonoff's, that as long as he had known Mrs. Leonoff he had regarded her as a friend and had placed great confidence in her. He respected her intelligence and regarded her as a very competent person. To her they gave the appearance of being two people who shared each other's full confidence.

In further evidence of the mutual trust and confidence and intimacy existing between the two, is the fact that at the time Mrs. Leonoff drew Rugani's will, she also drew and executed her own will making him the sole legatee to the exclusion of her own relatives. His confidence in her is demonstrated again by his placing in her keeping the will and the deeds contained in the envelope bearing the endorsement, "To be opened at my death." He trusted her not to open the envelope before, and not to record the deeds until, he died. As she testified he took her upstairs to his room and had her place the documents in a chest which he locked. He then handed her a key to the chest and said, "If anything happens to me take them to the City Hall."

In addition to the fact that there existed between the decedent and Mrs. Leonoff a friendly and intimate relation of trust and confidence, she assumed a position of trust when she undertook to prepare his will, the two deeds, and the letters to the insurance companies. The evidence is that she prepared the documents from her own forms and not at the dictation of the decedent. This is supported by her admission that "I completely forgot to put in the non-contest clause." Having voluntarily assumed such a position of trust and confidence, as the court said in *Estate of Lances*, 216 Cal. 397, 403 [14 P.2d 768], she "must be deemed bound by it."

The evidence produced by the respondents upon the trial is of such a substantial character that when taken as a whole it precludes the question that a confidential relationship did

not in fact exist between the proponent and the testator and abundantly sustains the finding of undue influence with respect to both the will and the deeds.

Appellant raises no question with respect to the finding that the deeds were not delivered. It is unnecessary, therefore, for us to comment upon this phase of the case.

The judgment is affirmed.

Nourse, P. J., and Goodell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 13, 1952.