Filed 11/12/24 (unmodified opn. attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DELLA HAMLIN et al.,<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>ZAKIYA JENDAYI, as Trustee, etc.,<br><br>      Defendant and Appellant. | A167695<br><br>(Alameda County<br>Super. Ct. No. RG20061734)<br><br>**ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION**<br>**[No Change in Judgment]** |

**BY THE COURT:**

Appellant's petition for rehearing, received on November 4, 2024, is denied as untimely. (Cal. Rules of Court, rule 8.268(b)(1)(A).)

On its own motion, the court modifies the opinion filed October 17, 2024, as follows:

1. On page 1, second paragraph, insert "potential" before the words "intestate heirs" in the first sentence, so that it reads:

In the published portion of this opinion, we conclude that respondents, as potential intestate heirs of Dr. Head disinherited by the trust, had standing to contest the instrument in the probate court and that their petition was not barred under Probate Code section 17200.

2. On page 12, first full paragraph, insert "potential" before the words "intestate heirs" in the second sentence, so that it reads:

1

As potential intestate heirs of Dr. Head, respondents had an actual and concrete interest in Dr. Head's estate and in invaliding that Trust that purported to disinherit them.

There is no change in the appellate judgment.

Dated: __November 12, 2024__            __TUCHER, P.J._____ P.J.

Filed 10/17/24 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DELLA HAMLIN et al.,<br>　　　Plaintiffs and Respondents,<br>v.<br>ZAKIYA JENDAYI, as Trustee, etc.,<br>　　　Defendant and Appellant. | A167695<br><br>(Alameda County<br>Super. Ct. No. RP20061734) |

Dr. Laura Dean Head passed away in 2013, survived by her sisters, respondents Della Hamlin and Helaine Head. Two months before her death, Dr. Head went into hospice care at the home of a former student and friend, appellant Zakiya Jendayi, and during that time, Dr. Head executed a trust instrument naming Jendayi as the trustee and sole beneficiary of the trust. In 2020, respondents petitioned the probate court to invalidate the trust on the grounds of undue influence, lack of capacity, and forgery. After a 17-day bench trial, the court granted the petition, finding Jendayi exerted undue influence over Dr. Head to execute the trust instrument.

In the published portion of this opinion, we conclude that respondents, as intestate heirs of Dr. Head disinherited by the trust, had standing to contest the instrument in the probate court and that their petition was not

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B., C., and D. of the Discussion.

1

barred under Probate Code section 17200. In the unpublished portion of this opinion, we conclude substantial evidence supported the court's application of the common law presumption of undue influence, as well as its finding that Jendayi unduly influenced Dr. Head to execute the trust instrument. We also reject Jendayi's claims of judicial bias and conclude any deficiencies in the probate court's statement of decision were harmless. Accordingly, we will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual History

At all relevant times, Dr. Head was employed as a college professor at San Francisco State University (SFSU). She and Jendayi met in 1985 when Jendayi was a student at SFSU. The two kept in touch over the years, and on a few occasions, Dr. Head provided letters of recommendation for Jendayi when she applied to graduate schools.

At trial, Jendayi described her relationship with Dr. Head as "intimate and personal," "special," "physical," and "sacred," but she refused to elaborate further on privacy grounds. Jendayi also submitted documentary evidence of their relationship, including photographs of the two at social events, and letters and cards that she had sent to Dr. Head over the years. One of Dr. Head's former students testified seeing Jendayi and Dr. Head together in public on numerous occasions from 1988 through 2012.

The following events occurred in 2013 unless otherwise noted.

On April 2, SFSU requested a welfare check on Dr. Head after she failed to appear for work for over a week. Police officers found Dr. Head in an "uninhabitable" house with possums living in it. Dr. Head was reportedly "lying in [a] very small space in [a] hoarded room floor to ceiling." She was

2

emaciated and unable to walk or state the date. Officers feared she "may die of self-neglect."

Dr. Head was admitted to Kaiser hospital in Oakland where she was diagnosed with gastroesophageal junction cancer, acute renal failure, chronic alcoholic cirrhosis, chronic anemia, nausea and vomiting, severe protein calorie malnutrition, pulmonary nodule, bacteriuria, and hypokalemia. Medical records showed that Dr. Head had recently experienced significant weight loss—eight pounds in the past month and 70 pounds in past two years—and had not eaten or had any liquids in almost a week.

Dr. Head's medical records identified her "sister" as the "DPOA" (or durable power of attorney) and listed Hamlin as her sole emergency contact. However, Dr. Head reported to a social worker at the hospital that she was "estranged from her two sisters." At trial, social worker Jennifer Hopping testified that she provided Dr. Head with various brochures and forms, including a power of attorney form, and asked Dr. Head whom she wanted to make medical decisions on her behalf. Dr. Head identified Jendayi and confirmed she did not want her family to be contacted.

On April 9, while still hospitalized, Dr. Head executed a power of attorney and an advanced healthcare directive naming Jendayi as her primary agent. Jendayi was present during the signing. By its terms, the power of attorney was not effective until a licensed physician declared Dr. Head to be incapacitated.

Hamlin testified that she visited her sister briefly in her hospital room, and that Dr. Head "perked up a little bit" when Hamlin touched her hand. After Hamlin was told by a nurse to wait outside, Hamlin received a phone call from Jim Rogers, a retreat operations director, who told her that Dr. Head was supposed to attend a retreat from April 9th to the 14th. Rogers

3

said he contacted Hamlin because Dr. Head had identified her as an emergency contact while registering for the retreat. Hamlin further testified that she " 'had words' " with Jendayi, whom she met for the first time at the hospital, because Jendayi was not forthcoming about Dr. Head's condition and refused to allow Hamlin to make copies of the durable power of attorney and advanced healthcare directive.

Regarding the reports of estrangement between the sisters, Hamlin acknowledged in her testimony that she saw Dr. Head "[v]ery rarely" because Dr. Head "had been drinking for quite a while and ended up removing herself from everyone." The last time Hamlin saw Dr. Head was in or around 1997 or 1998. However, Hamlin never knew that Dr. Head wanted no contact with her.

Helaine[1] testified that she and Dr. Head were still close and that they often spent holidays together. Helaine denied the two were estranged and stated that "[e]verything changed when [Dr. Head] was in the hospital and [Jendayi] came in." Helaine further testified she had never heard of Jendayi until Dr. Head fell ill.

On April 12, Dr. Head was discharged from Kaiser on hospice, released into Jendayi's care, and moved into Jendayi's apartment. That same day, Jendayi transferred the title to Dr. Head's vehicle to herself and added herself as the power of attorney to Dr. Head's bank account.

Dr. Head's treating physician, Stephen Sarafian, M.D., issued a discharge letter dated April 12, stating that Dr. Head was "unable properly to care for herself, her person, and her property"; that she was "incapable of providing for her own needs for food, clothing, or shelter"; and that her

---

[1] We use Helaine Head's first name to avoid confusion. No disrespect is intended.

4

"mental state renders her unable to manage her own financial resources and/or to resist fraud or undue influence." Asked at trial about reports that Dr. Head's mental status improved after her discharge, Dr. Sarafian explained that mental status may fluctuate, but he still expected Dr. Head to undergo a "significant decline" from her cancer, and he maintained that the statements in his letter were true to a reasonable medical certainty.

In early April, Jendayi contacted attorney Elaine Lee by telephone and asked her to draft an estate plan for Dr. Head. Jendayi testified that she did so on instructions from Dr. Head. Lee sent Jendayi a client intake form and an attorney-client fee agreement, which Jendayi completed.

The fee agreement named Jendayi, not Dr. Head, as Lee's client, and Dr. Head's name was not mentioned anywhere in the agreement. Lee testified that Jendayi said she signed the fee agreement on Dr. Head's behalf under the power of attorney.

In the client intake form, Jendayi identified herself as acting under a power of attorney. She further indicated that Dr. Head's assets included, among other things, a residence on Randolph Avenue in Oakland. In a section asking for information on "**parents, brothers, sisters, grandparents,** and others who will be beneficiary, trustee or executor in your estate plan," Jendayi crossed out the blank spaces and wrote, "N/A." Jendayi also crossed out portions of the intake form regarding gifts, except to indicate that Dr. Head wished to disinherit her sisters. Jendayi testified she never verbally told Lee to name her as a beneficiary and did not learn of her beneficiary status until after the estate plan was drafted.

Based on the information in the client intake form, Lee prepared a "rough draft" of the Laura Dean Head Living Trust (the Trust) and met with Jendayi and Dr. Head on April 15. Lee testified that the April 15 meeting

5

was the first time she spoke to Dr. Head, and that she and Dr. Head met alone behind closed doors. According to Lee, Dr. Head stated her intent to make Jendayi the sole beneficiary of the Trust and confirmed that nothing was to be left to her sisters. Lee believed Dr. Head was acting of her own free will and did not explore the relationship between Dr. Head and Jendayi because "they seemed like friends. Nothing seemed suspicious."

At trial, Lee was asked whether there were any substantive changes between the rough draft of the Trust that she prepared prior to the April 15 meeting and the final product. Lee responded, "I don't remember there being any major changes."

On June 5, at around 3:00 a.m., Dr. Head was admitted to the Kaiser hospital emergency room vomiting blood. A note in Dr. Head's medical records stated, "mental status, disturbance of consciousness." (Capitalization omitted.) Jendayi, under the power of attorney, signed a consent form to provide Dr. Head with a blood transfusion, stating Dr. Head was "too sick" to sign it herself.

According to Jendayi's trial testimony, sometime after 6:00 p.m. on June 5, Dr. Head asked Jendayi to retrieve the still-unsigned copy of the Trust from her apartment. Jendayi knew where Dr. Head kept the copy of the Trust because they shared a bedroom. Jendayi then contacted her friend, notary Trina Easley-Jackson, and two persons (a neighbor named Jody Shelton, and Jody's friend, David) to witness the execution of the Trust. Jendayi also contacted attorney Lee, but Jendayi did not disclose that Dr. Head had been rushed to the hospital on an emergency basis that day. Although Lee testified at trial that she would have still assisted in the execution of the Trust had she been so informed, the probate court admitted Lee's deposition transcript reflecting her contrary testimony that she

6

" '[p]robably [would] not' " have executed the Trust on June 5 had she been told of the circumstances of Dr. Head's emergency hospitalization.

At approximately 10:30 p.m. on June 5, Dr. Head executed the Trust in her hospital room. The Trust named Dr. Head as the original trustee and stated that upon her death or incapacity, "the successor trustee shall be my friend, Zakiya Jendayi." The Trust instructed the trustee, upon Dr. Head's death, to distribute "the entire trust estate" to Jendayi as the primary beneficiary if she survived Dr. Head, and if not, to Jendayi's mother, Hattie Simsisulu. If Jendayi and Simsisulu predeceased Dr. Head, the trust estate would go to the United Negro College Fund. The Trust contained a no-contest clause disinheriting any heir, relative, or beneficiary who contested the validity of the Trust and its provisions, as well as a disinheritance provision stating that Dr. Head "generally and specifically intentionally disinherit[ed]" anyone claiming to be her heirs at law.

The Trust property consisted of Dr. Head's "interest in the property described in the attached Schedule A document." Though no such schedule appears in the record, there was considerable testimony regarding Dr. Head's execution of two pour-over wills, the first of which was executed on June 5 around the same time as the Trust, along with a trust transfer deed transferring the Randolph Avenue residence to the Trust. The second pour-over will was executed three days later, purportedly to fix grammatical and other errors in the June 5 will, and to re-execute the will with witnesses Dr. Head personally knew. The record also discloses Jendayi's filing of a petition to probate Dr. Head's estate, case No. RP20066047 (the '047 case). At trial in the instant matter, Jendayi testified that her petition in the '047 case (which is not at issue here) identifies the Randolph Avenue residence as an asset of Dr. Head's estate and values the home at approximately $750,000. Thus, it

7

appears undisputed that one of the main assets Jendayi was to receive as the beneficiary of the Trust was the Randolph Avenue residence.

On June 19, Dr. Head died at the age of 64 without spouse, issue, or living parents.

## B. Procedural History

As Hamlin explained at trial, Dr. Head was the administrator of their deceased mother's estate. But in March 2020, about two months before respondents initiated the instant matter, Jendayi filed a petition in the Alameda County probate court "for distribution rights on the property of [respondents'] mother" in case No. RP12653607 (hereafter the '607 case, which is not at issue here). (Capitalization omitted.) Jendayi explained at trial that she filed the petition in the '607 case pursuant to a provision in the Trust giving her " '[t]he power to receive additional property, from any source, and add to my trust.' " (Capitalization omitted.) In other words, Jendayi initiated the '607 case in order to claim certain properties of Dr. Head's and respondents' deceased mother as additional assets of the Trust.

On May 18, 2020, respondents initiated the instant matter by filing a verified petition to invalidate the Trust on the grounds of undue influence, lack of capacity, and/or forgery. The petition alleged it concerns the internal affairs of the Trust, giving the probate court jurisdiction under Probate Code section 17000.[2]

### 1. Hearing on Standing

Early in the litigation, the trial court raised questions regarding respondents' standing to sue. At a hearing in May 2021, the probate court announced it had "issues with standing" because respondents were neither trustees nor beneficiaries under section 17200, which provides in relevant

---

[2] All further unspecified statutory references are to the Probate Code.

8

part: "Except as provided in Section 15800, a trustee or beneficiary of a trust may petition the court under this chapter concerning the internal affairs of the trust or to determine the existence of the trust." (§ 17200, subd. (a).) After cautioning respondents they did not have standing under section 17200, the court permitted the action to proceed after respondents clarified they were relying on other legal theories such as financial elder abuse and invalidation.

### 2. Trial

A bench trial commenced in July 2022 and was held over the course of 17 days. Jendayi represented herself during the proceedings.

In August 2022, after respondents completed their case-in-chief, they sought application of a presumption of undue influence. After hearing argument from the parties, the probate court found the Trust was presumptively the product of Jendayi's undue influence. It then shifted the burden to Jendayi to affirmatively disprove undue influence.

After the conclusion of testimony, the parties submitted written closing arguments and responsive briefs. The probate court issued a proposed statement of decision, and Jendayi submitted written objections.

The probate court then issued its final statement of decision in favor of respondents. The court first found that Dr. Head did not lack contractual capacity to execute the Trust, and that there was "no credible evidence of forgery." However, as to whether Dr. Head was unduly influenced to execute the Trust, the court referred back to its earlier ruling shifting the burden of proof to Jendayi and found that Jendayi "failed to meet her burden of proof by a preponderance of the evidence that the Trust was not the product of undue influence." The court considered the factors set forth in Welfare and Institutions Code, section 15610.70, subdivision (a), for undue influence and

9

found that Dr. Head was "vulnerable" and "completely dependent" on Jendayi; that Jendayi exerted apparent authority as Dr. Head's power of attorney and "controlled Dr. Head's necessities of life, food, and hospice care"; that Jendayi used "affection" to unduly influence Dr. Head; and that Jendayi effected changes in Dr. Head's property rights by calling attorney Lee to prepare the Trust for Dr. Head, completing the client intake form and signing the attorney-client fee agreement, and giving Lee the information as to the beneficiary of the Trust. The court further found that Jendayi unduly benefited from the Trust because it gave her "significant assets" including Dr. Head's "real property which has a current estimated value of $800,000.00 and a claim to [Dr. Head's] deceased mother's estate." The court found this result to be "inequitable because the evidence shows that [Jendayi] was a former student and friend who, at best, cared for [Dr. Head] for the last two months of her life."

Based on these findings, the probate court invalidated the Trust and ordered "all Trust assets transferred forthwith to the Special Administrator of the Estate of Laura Dean Head, Phillip Campbell, in [the '047 case]."

Respondents served notice of entry of judgment, and this appeal followed.[3]

## DISCUSSION

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are

---

[3] We previously deferred ruling on respondents' unopposed request for judicial notice of the reporter's transcript of the June 2, 2023, hearing on Jendayi's motion for a new trial. We now grant the request. (Evid. Code, § 452, subd. (d).)

10

liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.  [Citation.]  [¶] A single witness's testimony may constitute substantial evidence to support a finding.  [Citation.]  It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.  [Citation.]  'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)

## A. Standing

We begin with the general observation that "standing for purposes of the Probate Code is a fluid concept dependent on the nature of the proceeding before the trial court and the parties' relationship to the proceeding, as well as to the trust (or estate)." (*Arman v. Bank of Am.* (1999) 74 Cal.App.4th 697, 702–703.)  In general, " '[t]o have standing, a party must be beneficially interested in the controversy, and have "some special interest to be served or some particular right to be preserved or protected."  [Citation.]  This interest must be concrete and actual, and must not be conjectural or hypothetical.' " (*Limon v. Circle K. Stores, Inc.* (2022) 84 Cal.App.5th 671, 699.)  Interested persons have legal standing to contest the provisions of a trust.  (*Schwan v. Permann* (2018) 28 Cal.App.5th 678, 698.)  The Probate Code defines " 'interested person' " broadly as including an "[a]n heir, devisee, child, spouse, creditor, beneficiary, and any other person having a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding" (§ 48, subd. (a)), and its meaning "may vary from time to time and shall be determined according to the particular purposes of, and matter involved in, any proceeding" (*id.*, subd. (b)).  In turn, an "heir"

11

includes "any person . . . who is entitled to take property of the decedent by intestate succession under this code." (§ 44.) Consequently, the probate court "has flexibility in determining whether to permit a party to participate as an interested party" and may give standing to "anyone having an interest in an estate which may be affected by a probate proceeding." (*Estate of Sobol* (2014) 225 Cal.App.4th 772, 782 (*Sobol*).)

There can be no dispute that respondents were beneficially interested in the controversy before the probate court. As intestate heirs of Dr. Head, respondents had an actual and concrete interest in Dr. Head's estate and in invalidating the Trust that purported to disinherit them. Thus, the probate court had broad flexibility to permit respondents to maintain this trust contest in light of their relationship to Dr. Head and the trust estate. (*Sobol*, *supra*, 225 Cal.App.4th at p. 782; see *Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1125 [purported heir petitioned probate court claiming entitlement to portion of trust under laws of intestacy].)

*Olson v. Toy* (1996) 46 Cal.App.4th 818 (*Olson*) is instructive. There, the court held that an heir had standing to bring a civil action for declaratory relief and imposition of a constructive trust in order to invalidate an inter vivos trust based on allegations that the decedent lacked mental capacity and was unduly influenced to execute the trust prior to her death. (*Id.* at pp. 821, 823.) Though *Olson* involved proceedings in the superior court, we see no reason why the probate court, which "is a court of general jurisdiction and has all the powers of the superior court" (§ 17001), would be unable to confer similar standing upon respondents in this case.

In challenging respondents' standing, Jendayi maintains that only trustees and trust beneficiaries have standing to contest a trust. She relies on section 17200, which as indicated states in relevant part: "Except as

12

provided in Section 15800, a trustee or beneficiary of a trust may petition the court under this chapter concerning the internal affairs of the trust or to determine the existence of the trust." (§ 17200, subd. (a).) We are not convinced.

Section 17200 contains no language purporting to limit standing only to trustees and beneficiaries of a trust or otherwise indicating the Legislature's intent to exclude others from contesting a trust in the probate court. Rather, the statute simply provides that trustees and trust beneficiaries "may" petition the court under this chapter "[e]xcept" as provided in section 15800— i.e., during the time the trust remains revocable, when joint action of settlor and beneficiaries is required, or "to the extent that the trust instrument otherwise provides." (§ 17200, subd. (a), citing § 15800.) But the mere use of the words "trustee or beneficiary" is hardly an indication of a legislative intent to circumscribe the probate court's power to confer standing to contest a trust on persons other than trustees and trust beneficiaries.

Indeed, Jendayi's cramped interpretation of section 17200 is problematic because it conflicts with language in section 16061.7, which sets forth the trustee's duty to serve notification of various events related to a trust, including when a revocable trust or portion thereof becomes irrevocable due to the settlor's death. (§ 16061.7, subd. (a)(1).) If the event that requires notification is the death of a settlor, notice must be served not only on each trust beneficiary but also on "[e]ach heir of the deceased settlor" (*id.*, subd. (b)(1), (2)), and such notice "shall" include the following language: " 'You may not bring an action to contest the trust more than 120 days from the date this notification by the trustee is served upon you or 60 days from the date on which a copy of the terms of the trust is delivered to you during that 120-day period, whichever is later' " (*id.*, subd. (h)). The statutory

13

requirement that each heir of a deceased settlor be given notice of the deadlines in which to bring "an action to contest the trust" impliedly reflects the Legislature's awareness of the heir's ability to do just that. If Jendayi's construction were adopted, section 17200 would bar standing to the very persons entitled to receive statutory notice of their right to contest the trust, rendering portions of section 16061.7, subdivisions (b) and (h), superfluous. That is a construction we must avoid. (*People v. Arias* (2008) 45 Cal.4th 169, 180.)

The California Supreme Court recently examined section 17200 in *Barefoot v. Jennings* (2020) 8 Cal.5th 822 (*Barefoot*), and held that standing to petition the probate court under section 17200 extends not only to current trust beneficiaries but also to individuals formerly named as beneficiaries who, in a well-pleaded complaint, "claim that trust amendments eliminating their beneficiary status arose from incompetence, undue influence, or fraud." (*Barefoot*, at pp. 825, 828.) In so holding, the *Barefoot* court started by citing longstanding decisional authority recognizing that "the Probate Code ' "was intended to broaden the jurisdiction of the probate court so as to give that court jurisdiction over practically all controversies which might arise between the trustees and those claiming to be beneficiaries under the trust." ' " (*Barefoot*, at pp. 827–828.) The court then emphasized the probate court's " 'inherent power to decide all incidental issues necessary to carry out its express powers to supervise the administration of the trust' " (*id.* at p. 829), as well as the "wide latitude" granted by section 17206 to " 'make any orders and take any other action necessary or proper to dispose of the matters presented by the petition,' " (*id.* at p. 828 [holding section 17206 "supports a finding of standing here"]). In the words of the *Barefoot* court, "an expansive reading of the standing afforded to trust challenges under section 17200 'not

only makes sense as a matter of judicial economy, but it also recognizes the probate court's inherent power to decide all incidental issues necessary to carry out its express powers to supervise the administration of the trust.' " (*Id.*, at pp. 827–828.)

*Barefoot* expressly left open the question whether "an heir who was never a trust beneficiary has standing under the Probate Code to challenge that trust." (*Barefoot*, *supra*, 8 Cal.5th at p. 825, fn. 2.) That is the situation presented in this case, as respondents were not named as beneficiaries under any prior version of the Trust. We have already concluded that nothing in section 17200 *limits* petitioner standing before the probate court to *only* trustees and trust beneficiaries or otherwise constrains the probate court from conferring standing on other persons who assert a property right or claim against a trust estate. Though *Barefoot* is not directly controlling on the facts of this case, our conclusion comports with *Barefoot*'s admonition to read Probate Code sections "consistent with the statutory scheme as a whole," its recognition of the broad jurisdiction and discretionary powers of the probate court, including the power to confer standing under section 17206 as necessary or proper to dispose of matters presented by a petition, and its consideration of judicial economy and the public interest in preventing the administration of a trust that has been procured through fraud or undue influence. (*Barefoot*, at pp. 827–830, & fn. 3.)[4]

---

[4] Notably, commentators have concluded that "[t]hose who would gain a pecuniary benefit from invalidating the trust should have standing to bring a trust contest" and that "[u]nder most circumstances, the contestants are the beneficiaries of an earlier estate plan or the heirs at law." (Campisi & Latham, Cal. Trust and Probate Litigation (Cont.Ed.Bar 2024) § 20.6; see also § 20.31 [form "petition to determine the validity of purported trust" pursuant to "Probate Code § 17000"].) In other words, secondary authority recognizes the standing of heirs to bring trust contests under the Probate

15

For the foregoing reasons, we hold the probate court did not err in concluding respondents had standing to contest the Trust.  Accordingly, we need not resolve Jendayi's alternative contention that assuming respondents had standing to assert financial elder abuse claims in the probate court, those claims were time-barred.[5]

## B. Undue Influence

### 1. Presumption of Undue Influence

"Although a person challenging the testamentary instrument ordinarily bears the burden of proving undue influence [citation], [the Supreme Court] and the Courts of Appeal have held that a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the

---

Code.  (See *Earl W. Schott, Inc. v. Kalar* (1993) 20 Cal.App.4th 943, 946, fn. 4 [secondary authority may be persuasive authority].)

[5]     To be clear, Jendayi only challenges the timeliness of respondents' financial elder abuse claims as an alternative to her Probate Code standing argument.  She expressly does not challenge the timeliness of the petition to the extent it is brought under the Probate Code, perhaps conceding respondents' argument that because respondents were not served with the required notice of trustee under section 16061.7, the statute of limitations of section 16061.8 never began to run.  That said, we acknowledge Jendayi's point that respondents have taken shifting positions on the gravamen of their petition in order to navigate around her standing challenges, arguing below that their petition asserted financial elder abuse claims, not claims under the Probate Code, while contending just the opposite on appeal.  But beyond pointing out the inconsistency, Jendayi does not specifically argue or provide supporting legal authority that respondents should be judicially estopped from raising an inconsistent position on appeal.  (See *Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 187–188 (*Bucur*) [discussing judicial estoppel].)  Thus, we treat the issue as forfeited.  (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 629–630.)  Furthermore, and in any event, in light of the questions left open after *Barefoot*, and mindful of the caution that must be exercised in applying the doctrine of judicial estoppel, we believe this case does not present such egregious circumstances as to justify application of judicial estoppel.  (See *Bucur*, at pp. 187–188.)

16

person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96–97.) "If this presumption is activated, it shifts to the proponent of the [instrument] the burden of producing proof by a preponderance of evidence that the [instrument] was not procured by undue influence. It is for the trier of fact to determine whether the presumption will apply and whether the burden of rebutting it has been satisfied." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605 (*Sarabia*).)

In applying the undue influence presumption, the probate court necessarily found that a confidential relationship existed between Dr. Head and Jendayi; that Jendayi actively participated in procuring the Trust; and that the Trust would unduly benefit Jendayi. We review the court's findings for substantial evidence. (*David v. Hermann* (2005) 129 Cal.App.4th 672, 684–685.)

### a. Confidential Relationship

Jendayi first contends the probate court erred as a matter of law by adopting the definition of confidential relationship articulated in *Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257 (*Richelle L.*). Jendayi argues that *Richelle L.* is distinguishable because it did not involve testamentary instruments and instead addressed whether the relationship between a priest and church member could give rise to tort liability. We conclude the court did not err in adopting the *Richelle L.* standard.

In *Estate of Cover* (1922) 188 Cal. 133, 143 (which involved a challenge to letters of administration issued to a widow), and *Estate of Rugani* (1952) 108 Cal.App.2d 624, 630 (which involved a will contest), the appellate courts

17

held a confidential relation exists where " 'trust and confidence is reposed by one person in the integrity and fidelity of another.' " *Richelle L.* echoed this language by stating that a confidential relation " ' "ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he [or she] voluntarily accepts or assumes to accept the confidence, can take no advantage from his [or her] acts relating to the interest of the other party without the latter's knowledge or consent." ' " (*Richelle L.*, *supra*, 106 Cal.App.4th at p. 270.) In support, *Richelle L.* cited *Herbert v. Lankershim* (1937) 9 Cal.2d 409, which applied the presumption of undue influence in a claim against an estate by the companion and caretaker of the deceased. In short, *Richelle L.*'s definition of confidential relation is consistent with the formulations set forth by other courts in the testamentary context and therefore provides the applicable test in this case.

As articulated in *Richelle L.*, the essential elements of a confidential relationship are: " '1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4) prevents the weaker party from effectively protecting itself.' " (*Richelle L.*, *supra*, 106 Cal.pp.4th at p. 272.) Vulnerability is a necessary and essential predicate of a confidential relationship. (*Id.* at p. 273.) " 'Because confidential relations do not fall into well-defined categories of law and depend heavily on the circumstances, they are more difficult to identify than fiduciary relations.' [Citation.] The existence of a confidential relationship is a question of fact, and ' "the question is only whether the [allegedly weaker party] actually reposed such trust and confidence in the other, and whether

the other 'accepted the relationship.' ' " (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1160–1161.)

We conclude substantial evidence supports the probate court's finding of Dr. Head's vulnerability. "Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability." (Welf. & Inst. Code, § 15610.70, subd. (a)(1).) Here, Dr. Head was terminally ill and placed in hospice care with Jendayi. On the day the Trust was executed, Dr. Head had been rushed to the hospital on an emergency basis and was so ill that Jendayi had to sign a blood transfusion consent form on her behalf. Meanwhile, Dr. Sarafian's April 12 letter explicitly stated that upon her discharge from Kaiser in April 2013, Dr. Head was "unable properly to care for herself, her person, and her property" and "incapable of providing for her own needs for food, clothing, or shelter." The evidence amply supported a finding that Dr. Head was extremely vulnerable and dependent on Jendayi, placing her in a position of relative weakness at the time the Trust was executed.

Jendayi insists Dr. Head was not vulnerable for purposes of *Richelle L.* because at the time of her death, Dr. Head was still a highly educated college professor of only 64 years of age. She also notes that numerous witnesses, including a Kaiser doctor, a registered nurse, a social worker, and attorney Lee, all testified that Dr. Head was competent, lucid, and capable of making her own decisions, and the probate court did not find her incompetent. But in reviewing the lower court's factual findings for substantial evidence, we accept the evidence that supports the prevailing party and disregard the contrary evidence, while drawing all reasonable inferences to uphold the

19

judgment. (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) As discussed, the evidence of Dr. Head's severe illness and dependency on Jendayi amply supported the vulnerability finding. Moreover, the court presumably credited Dr. Sarafian's testimony that notwithstanding fluctuations in Dr. Head's mental status, she would still be unable to manage her own affairs or resist undue influence as her illnesses progressed. We also infer that the court found Lee impeached by her own deposition testimony admitting she likely would not have executed the Trust had she been informed of the circumstances of Dr. Head's emergency hospitalization.

Finally, Jendayi argues that mere friendship and affection does not create a confidential relationship. This is true so far as it goes (see *Blackburn v. Allen* (1963) 218 Cal.App.2d 30, 34; *Meyer v. Zuber* (1928) 92 Cal.App.767, 772), but we may reasonably infer from the record that the probate court did not rest its confidential relationship finding solely on the friendship between Dr. Head and Jendayi. Notably, the evidence demonstrated that Jendayi acted on numerous occasions as Dr. Head's attorney-in-fact pursuant to a power of attorney, including transferring title to Dr. Head's vehicle to herself, adding herself to Dr. Head's bank account, and retaining attorney Lee to draft Dr. Head's testamentary instruments. Courts have consistently found a confidential relationship when the beneficiary runs the settlor's financial affairs or has the power of attorney prior to the time a will or other testamentary document was executed. (See, e.g., *Sarabia, supra*, 221 Cal.App.3d at p. 603; *Estate of Straisinger* (1967) 247 Cal.App.2d 574, 579, 585; *Faulkner v. Beatty* (1958) 161 Cal.App.2d 547, 549, 550–551; *Estate of Hull* (1944) 63 Cal.App.2d 135, 139, 141–142.)

20

In sum, the probate court did not err in finding a confidential relationship.

### b. Active Participation

The active participation element requires proof of a "causal link between the ability to influence the testator arising from the confidential relationship and the unnatural document. Mere general influence is not enough. A contestant must show that the influence was brought directly to bear upon the testamentary act." (*Estate of Fritschi* (1963) 60 Cal.2d 367, 374.) "The procurement of a person to witness the will or of an attorney to draw it does not itself constitute active participation in the preparation of the will." (*Id.* at p. 376.) There must be activity " 'in the preparation of' " the testamentary document. (*Ibid.*; see *Estate of Swetmann* (2000) 85 Cal.App.4th 807, 819–820 (*Swetmann*) ["direct[ing] the drafted document to be written out in its final form"].)

Jendayi argues there was no substantial evidence of her active participation in the preparation of the Trust because the evidence at trial demonstrated it was the social workers who recommended Dr. Head prepare an estate plan and Jendayi merely followed Dr. Head's instructions to contact an estate planning attorney and arrange for their meeting. Jendayi also emphasizes that the attorney Lee's client intake form did not list Jendayi as the beneficiary of the Trust, and that Lee testified Jendayi did not take any part in creating or arriving at any part of the Trust.

Once again, Jendayi's contention is based on the evidence favorable to her but fails to account for contrary evidence. Drawing all reasonable inferences to uphold the judgment, we conclude the evidence circumstantially supported a finding that Jendayi actively participated in the preparation of the Trust. (See *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54

21

[substantial evidence includes circumstantial evidence and reasonable inferences flowing from it]; *Estate of Garibaldi* (1961) 57 Cal.2d 108, 113 [activity in procuring the execution of the will may be established by circumstantial evidence].)  Based on Lee's testimony that she made no "major changes" between the rough draft and the final Trust instrument, the probate court could reasonably find that the Trust was already in substantially final form when Lee met with Dr. Head on April 15.  That is, the rough draft— which Lee had prepared after speaking on the phone with Jendayi but before Lee met with Dr. Head on April 15—*already* named Jendayi as the sole beneficiary of the Trust.  Since Lee testified the April 15 meeting was the *first* instance in which she spoke to Dr. Head, the court could logically infer that the instruction to make Jendayi the beneficiary must have been made prior to that meeting, and that it was Jendayi who directed Lee to do so.  As such, substantial evidence supported a finding of Jendayi's active participation in "direct[ing] the drafted document to be written out in its final form." (*Swetmann*, *supra*, 85 Cal.App.4th at pp. 819–820.)

### c. Undue Benefit

The determination of an undue benefit "is based on a qualitative assessment of the evidence, not a quantitative one." (*Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035, 1060 (*Davidson*), disapproved on other grounds as stated in *Bernard v. Foley* (2006) 39 Cal.4th 794, 810–811.) The issue is not whether the beneficiary profited from the decedent's disposition of her estate; it is whether the profit was " 'undue.' " (*Davidson*, at p. 1060.)  A person "unduly benefit[s]" when he or she receives a bequest that is " 'unwarranted, excessive, inappropriate, unjustifiable or improper.' " (*Estate of Auen* (1994) 30 Cal.App.4th 300, 311.)  "To determine if the beneficiary's profit is 'undue' the trier must necessarily decide what

profit would be 'due.' These determinations cannot be made in an evidentiary vacuum. The trier of fact derives from the evidence introduced an appreciation of the respective relative standings of the beneficiary and the contestant to the decedent in order that the trier of fact can determine which party would be the more obvious object of the decedent's testamentary disposition." (*Sarabia, supra,* 221 Cal.App.3d at pp. 607–608.)

We conclude substantial evidence supported the probate court's finding of an undue benefit. First, there was no dispute that Jendayi stood to receive a substantial benefit from the Trust, including the Randolph Avenue residence and a claim to respondents' deceased mother's estate. This was a significant change from before the Trust was executed, when Dr. Head had no prior estate plan that included Jendayi as a beneficiary.

Second, the probate court could reasonably find based on the evidence of Dr. Head's relationships with her sisters and Jendayi that Jendayi was not the obvious object of Dr. Head's testamentary intent. (*Sarabia, supra,* 221 Cal.App.3d at p. 607.) The evidence of estrangement between Dr. Head and respondents was mixed. While Dr. Head reportedly told social workers and medical personnel that she and her sisters were estranged, these reports were made while Dr. Head was vulnerable and dependent from illness. Helaine flatly denied any estrangement between her and Dr. Head and testified that they saw each other often, and Dr. Head continued to hold Hamlin out as an emergency contact right up until her hospitalization in April 2013.

Meanwhile, the probate court could reasonably find that Jendayi's claim of an intimate romantic relationship with Dr. Head was unsupported by the evidence. Jendayi did not explain what she meant by a "sacred" relationship, and her unwillingness to elaborate beyond generalizations (i.e.,

23

"intimate," "personal," "special") hampered the court's ability to conduct a qualitative assessment of their relationship. Although the evidence and testimony demonstrated that Jendayi and Dr. Head maintained a friendship over many years, there was no evidence of a serious romantic relationship other than Jendayi's testimony, which the court was entitled to reject. Indeed, Jendayi admitted at trial that she was dating someone else at the time of Dr. Head's hospitalization in April 2013, and that she had not seen Dr. Head since December 2012 and could not recall the last time she was in Dr. Head's home. The documentary evidence submitted by Jendayi consisted mostly of cards and letters that Jendayi sent to Dr. Head, but lacking in the record was any evidence that Dr. Head reciprocated Jendayi's affections. On this score, the probate court was entitled to reject Jendayi's explanation that all cards and letters that Dr. Head had sent to her were destroyed in a fire. Viewing the record in a light favorable to the judgment, the picture that emerged from trial was that of a mentor-mentee relationship and friendship, rather than a romantic partnership that would help to explain the substantial benefit Jendayi was to receive under the Trust. Considering the evidence as a whole, the probate court could reasonably find that Jendayi received an undue profit from the Trust.

For all of these reasons, we conclude substantial evidence supported the probate court's application of the common law presumption of undue influence.

## 2. Finding of Undue Influence

In probate cases, " '[u]ndue influence' has the same meaning as" used in the Welfare and Institutions Code—"excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (§ 86; Welf. & Inst. Code, § 15610.70, subd. (a).)

In determining whether a result was produced by undue influence, courts consider:  (1) the victim's vulnerability; (2) the influencer's apparent authority; (3) the tactics used by the influencer; and (4) the equity of the result.  (Welf. & Inst. Code, § 15610.70, subd. (a)(1)–(4).)  " 'It [is] for the trial court to say whether the evidence offered by the plaintiff outweighs the presumption.' "  (*Estate of Rugani* (1952) 108 Cal.App.2d 624, 629.)  We cannot conclude the probate court abused its discretion in finding that Jendayi failed to rebut the presumption of undue influence or in determining that undue influence led to Dr. Head's execution of the Trust.

First, and for reasons similar to those discussed above, we conclude substantial evidence supported the probate court's finding of Dr. Head's vulnerability.  (See Welf. & Inst. Code, § 15610.70, subd. (a)(1) [vulnerability may be demonstrated by illness and dependency].)

The second factor, the "influencer's apparent authority," may be demonstrated by the influencer's "status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification."  (Welf. & Inst. Code, § 15610.70, subd. (a)(2).)  This criterion was satisfied, as Jendayi undertook numerous acts as Dr. Head's agent-in-fact and under the power of attorney, including retaining Lee to draft the Trust, filling out the client intake form, taking control of Dr. Head's finances, and communicating with Dr. Head's healthcare providers, as reflected in the numerous medical records referring to Jendayi as Dr. Head's "DPOA."  Jendayi insists the power of attorney "never took effect, because [Dr. Head] was not deemed incapacitated."  This argument ignores Dr. Sarafian's April 12 letter stating that Dr. Head lacked capacity to care for herself, manage her own financial affairs, and resist undue influence.

25

The third factor, the influencer's actions or tactics, may be demonstrated by the influencer's "[u]se of affection, intimidation, or coercion" (Welf. & Inst. Code, § 15610.70, subd. (a)(3)(B)), and by the "[i]nitiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, [and] effecting changes at inappropriate times and places" (*id.*, subd. (a)(3)(C)). As previously discussed, the probate court could reasonably reject Jendayi's claim that she and Dr. Head had a longstanding romantic relationship and instead conclude Jendayi used affection as a tactic to influence Dr. Head while she was sick and vulnerable. We have also previously addressed how the evidence was capable of circumstantially proving that Jendayi directed Lee to make her (Jendayi) the sole beneficiary of the Trust, which supports the criterion that Jendayi initiated changes in Dr. Head's property rights.

Additionally, substantial evidence supported a finding that, in the particular circumstances of this case, the Trust was executed at an inappropriate time and place— i.e., in Dr. Head's hospital room while she was severely ill. The trial testimony reflected that Jendayi left the hospital room to retrieve the unsigned Trust instrument and hastily coordinated witnesses to be present for the signing. Jendayi never offered an explanation why, if Dr. Head was lucid in the weeks after Lee drafted the instrument in April, the Trust was not executed until Dr. Head fell severely ill on June 5. The evidence supported a finding that Jendayi hastily initiated changes in Dr. Head's property rights at an inappropriate time and place. (Welf. & Inst. Code, § 15610.70, subd. (a)(3)(C).)

The fourth factor, the equity of the result, involves "the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the

26

value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship." (Welf. & Inst. Code, § 15610.70, subd. (a)(4).) Here, the evidence demonstrated that prior to executing the Trust, Dr. Head had no estate plan benefiting Jendayi, but that once Dr. Head's health took a dramatic turn, Dr. Head executed testamentary instruments that would convey property of substantial value to Jendayi, including the Randolph Avenue home, and a claim to Dr. Head's deceased mother's estate. The court could reasonably conclude such substantial conveyances of property were inequitable.

In sum, we conclude substantial evidence supported the probate court's finding of undue influence.

**C. Judicial Bias**

Jendayi contends she was deprived of a fair trial in violation of various constitutional guarantees because the probate court was biased against her. We are not persuaded.

As a threshold matter, Jendayi failed to preserve this claim of error, as she "never claimed during trial . . . that [her] constitutional rights were violated because of judicial bias. 'It is too late to raise the issue for the first time on appeal.' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111.)

Furthermore, and in any event, Jendayi's arguments lack merit. The due process clause "sets an exceptionally stringent standard" for proving judicial bias. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589 (*Schmidt*).) "It is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation. . . . Numerous and continuous rulings against a party are not grounds for a finding of bias.' " (*Ibid.*)

Jendayi argues the probate court made biased evidentiary rulings in respondents' favor with regard to the admissibility of written witness

27

declarations.  For instance, she complains that the court granted respondents' request to admit a declaration from attorney Lee but denied Jendayi's request to admit a declaration of notary Easley-Jackson.  But far from demonstrating the court's bias, the record reflects that Jendayi simply did not object to respondents' request while respondents objected to Jendayi's.

Equally without merit is the argument that the probate court demonstrated bias by prompting respondents' counsel for objections to Jendayi's requests but not similarly prompting Jendayi.  Although it is a party's responsibility to make timely objections (Evid. Code, § 353), the probate court in this case had a general practice of asking if there were any objections before ruling on the admissibility of exhibits.  In only one instance cited by Jendayi did the court fail to prompt her for an objection.  We conclude this sole instance does not meet the "exceptionally stringent standard" for proving the probate court's judicial bias against Jendayi. (*Schmidt*, *supra*, at p. 589.)

Jendayi's remaining claims of bias are derivative of her arguments that the court erred in finding that respondents had standing to sue and in shifting the burden of proof to her to prove undue influence.  As we have discussed, these decisions were not erroneous, and in any event, the mere fact that the court made multiple rulings against Jendayi does not demonstrate judicial bias.  (*Schmidt*, *supra*, 44 Cal.App.5th at p. 589.)

**D. Statement of Decision**

"Under [Code of Civil Procedure] section 632, upon a party's request after trial, the court must issue a statement of decision 'explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial.'  And under [Code of Civil Procedure] section 634, if the

28

statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.' " (*Thompson, supra*, 6 Cal.App.5th at p. 981.)  " 'Without a statement of decision, the judgment is effectively insulated from review by the substantial evidence rule,' as we would have no means of ascertaining the trial court's reasoning or determining whether its findings on disputed factual issues support the judgment as a matter of law." (*Id*. at pp. 981–982.)

"In rendering a statement of decision under Code of Civil Procedure section 632, a trial court is required only to state ultimate rather than evidentiary facts; only when it fails to make findings on a material issue which would fairly disclose the trial court's determination would reversible error result.  [Citations.]  Even then, if the judgment is otherwise supported, the omission to make such findings is harmless error unless the evidence is sufficient to sustain a finding in the complaining party's favor which would have the effect of countervailing or destroying other findings." (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230.)  "In general, the failure to make a material finding on an issue supported by the pleadings and substantial evidence is harmless when the missing finding may reasonably be found to be implicit in other findings.  [Citation.]  The court's failure to make findings is also harmless when, under the facts of the case, the finding would necessarily have been adverse to the appellant." (*Rojas v. Mitchell* (1996) 50 Cal.App.4th 1445, 1450.)

Jendayi argues the statement of decision was defective because the probate court failed to provide the legal basis for its standing ruling.  As a preliminary matter, we observe that Jendayi failed to comply with the

statement of decision procedures by bringing this omission to the court's attention in her written objections to the proposed statement of decision. (See Code Civ. Proc., § 634.) In any event, Jendayi fails to demonstrate the omission was prejudicial, as the probate court adequately explained the legal basis for its ruling at the May 2021 hearing.

Jendayi next argues the statement of decision was defective because the probate court "failed to indicate what cause of action was being ruled on, aside from an amorphous finding of undue influence." Again, we note that Jendayi failed to bring this omission to the court's attention in her written objections to the proposed statement of decision. (See Code Civ. Proc., § 634.) Furthermore, as Jendayi acknowledges, the Probate Code and Welfare and Institutions Code share the same definition of undue influence, (§ 86; Welf. & Inst. Code, § 15610.70, subd. (a)), and the probate court expressly stated that its undue influence finding was based on Welfare and Institutions Code section 15610.70. Nothing more was required under section 632.

Finally, Jendayi argues the statement of decision was defective because the probate court did not address the statute of limitations issue. We may accept that Jendayi's challenge to the timeliness of respondents' claims was a principal controverted issue at trial. Jendayi asserted the statute of limitations as an affirmative defense in her response to the petition, raised the issue in her written closing statement, and brought the omission of the issue from the proposed statement of decision to the court's attention in her written objections, yet the court did not address the issue in its final statement of decision.

That said, Jendayi has not shown reversible error. Although a statute of limitations issue may present a mixed question of law and fact (*Oakes v. McCarthy Co.* (1968) 267 Cal.App.2d 231, 255), " '[w]here the facts are agreed

30

or ascertained, it is a question of law whether a case is barred by the statute of limitations.' " (*Stavropoulos v. Superior Court* (2006) 141 Cal.App.4th 190, 193.) "Code of Civil Procedure section 632, concerning statements of decision, applies to the determination of questions of fact, not to questions of law. Where the only issue is one of law, reversal for failure to issue a statement of decision is not required." (*Estate of Garrett* (2008) 159 Cal.App.4th 831, 840.) Here, Jendayi does not demonstrate that her statute of limitations challenge involved disputed questions of fact requiring findings under Code of Civil Procedure section 632. Indeed, as previously noted (see *ante*, footnote 5), Jendayi has entirely forfeited any challenge to the timeliness of respondents' petition to the extent it was brought under the Probate Code. As such, Jendayi fails to show error under Code of Civil Procedure section 632 or any prejudice from the omission.

## DISPOSITION

The judgment is affirmed.

_____
Fujisaki, J.

WE CONCUR:

_____
Tucher, P.J.

_____

Rodríguez, J.

Trial Court:       Alameda County Superior Court

Trial Judge:      Hon. Sandra Bean

Counsel:         Decker Law, James Decker and Griffin Schindler for
                       Objector and Appellant

                 Law Offices of Daniel Leahy, Daniel Leahy for Petitioners
                       and Respondents

*Hamlin v. Jendayi* (A167695)

33